UNITED STATES of America, Appellee,

v.

Thomas REDA, Appellant.

UNITED STATES of America, Appellee,

v.

Michael Edward O'CONNOR, Appellant.

UNITED STATES of America, Appellee,

v.

Clarence Dale
CUNNINGHAM, Appellant.

Nos. 84–2270, 84–2290 and 84–2331.

United States Court of Appeals,
Eighth Circuit.

Submitted April 25, 1985.

Decided June 13, 1985.

Paul Rosenberg, Des Moines, Iowa, for Reda.

Terry Wright, Des Moines, Iowa, for O'Connor.

Lylea Dodson, Des Moines, Iowa, for Cunningham.

Robert C. Dopf, Asst. U.S. Atty., Des Moines, Iowa, for appellee.

Before ROSS and BOWMAN, Circuit Judges, and OLIVER,* Senior District Judge.

JOHN W. OLIVER, Senior District Judge.

Thomas Reda, Michael Edward O'Connor and Clarence Dale Cunningham were indicted on May 24, 1984 in the Southern District of Iowa. The three-count indictment charged appellants in Count 1 with violation of 18 U.S.C. § 2314, transporting in interstate commerce from Las Vegas, Nevada to Des Moines, Iowa, stolen jewelry have a value in excess of $5,000; in Count 2 with a violation of 18 U.S.C. § 2315, concealing, storing, and bartering stolen jewelry, having a value in excess of $5,000, which had moved in interstate commerce, knowing the same to have been stolen; and in Count 3 with a violation of

---

* The Honorable John W. Oliver, Senior United States District Judge for the Western District of Missouri, sitting by designation.

18 U.S.C. § 371, conspiring together to transport in interstate commerce the stolen jewels.

Appellants present several issues for review which we shall address individually. We affirm the judgments of the district court in regard to each defendant.

## I. FACTS

On May 7, 1984, approximately $130,000 in jewelry belonging to Sam Angel was stolen from his car in Las Vegas, Nevada. Sam Angel was a self-employed jewelry salesman who operated in the casinos. He reported the theft on May 11, 1984. On May 14, 1984 Cunningham received a telephone call from O'Connor from Las Vegas. On May 15, according to the evidence presented by the government, O'Connor and Reda arrived in Des Moines on Ozark flight 641. Reda and O'Connor went to the Hyatt House Hotel where Reda, who registered under the name of Jack R. Weber, obtained adjoining rooms 417 and 419.

On May 16, 1984 Cunningham, identifying himself as Mr. Williams, contacted John Lacey, Assistant Manager of the Des Moines Gold and Silver Buyers, and arranged to meet him in the lobby of the hotel. Reda and Cunningham informed Lacey that there were a number of jewelry items available for purchase and escorted him to room 419. Lacey was shown a large suitcase filled with jewelry which still had identification tags and price tags on them. Reda told Lacey that the items were worth approximately $300,000 and that they could be purchased for ten cents on the dollar. Lacey asked if they were "hot." Reda said they were obtained in Ohio as a result of an insurance scheme. Lacey was left with a definite impression that they were stolen. Reda refused Lacey's offer of $10,000. Lacey indicated he would attempt to locate a buyer and left.

Lacey, however, contacted the F.B.I. who instructed him to contact Reda and inform him that Lacey had a friend coming in from Omaha who might be interested in purchasing the jewelry. At approximately 10:15 a.m., May 17, F.B.I. and state law enforcement agents set up surveillance of adjoining rooms 417 and 419. About 10:30 a.m. all three defendants were observed going and coming from room 417 to an automobile registered in Cunningham's name.

At approximately 1:15 p.m. Special Agent Peter Klismet met with Lacey and Reda in the hotel lounge. At 1:36 p.m. O'Connor was observed looking out of room 417 and placing a "Do Not Disturb" sign on the door. Five minutes later Reda took Klismet to room 419. Reda unlocked the adjoining door between room 417 and 419 and brought a suitcase containing the jewelry from room 417 to 419. Reda told Klismet that the jewels had been stolen in Ohio and stored for approximately three months. He gave the impression that he had received indemnification for them from an insurance company.

Klismet examined the jewelry and purportedly was attempting to determine whether he would buy it. Klismet asked whether Cunningham knew the items were "hot." Reda said, "He semi-knows." Reda also indicated the possibility of some future sales of gold coin medallions. Reda and Klismet discussed price, but Klismet indicated a desire to speak to Lacey before finalizing the deal.

After Klismet left at approximately 3:00 p.m. O'Connor and Cunningham carried suitcases later found to contain the jewelry to Cunningham's automobile. Minutes later Cunningham was arrested in the automobile with the jewelry and Reda and O'Connor were arrested in the hotel rooms.

O'Connor was carrying on his person a torn piece of paper containing a handwritten list of various jewelry items and figures totaling $211,000 and an address book listing the telephone numbers for Reda and Cunningham. A piece of paper matching the torn list was found on Reda containing the name Mike and a phone number. Cunningham was carrying the key to room 419.

There was a hole in the wall between rooms 417 and 419 behind the dresser and a hole in the dresser in room 417. Angel testified that he knew Cunningham and

O'Connor from playing cards with them in Las Vegas and that he had seen Reda "around" in that city but had never said two words to him. Two defense witnesses, Bundy and Courson, testified that they knew both Angel and Reda and that they had seen them in lengthy conversation with each other. In addition, witness Courson testified that Reda had told him that Angel was going to "front" him some jewelry to pull off some sort of a "scam."

None of the defendants testified. Reda's attorney, however, stated in his opening statement and in his closing argument that Reda had leased the jewelry from Sam Angel for the purpose of perpetrating a "scam on prospective purchasers by which Mr. Reda would get the purchasers' money and retain the jewelry." Reda's attorney contended that Reda planned to use the "leased" jewelry to attract prospective buyers; that Reda would show the jewelry in the hotel room; that he would place the buyer's money and the jewelry in a dresser drawer on the pretext of going to the car to get the rest of the jewelry; that someone in the adjoining room would remove both the money and the jewelry and be gone before the prospective buyer caught on. Reda's defense, as asserted through his attorney, was that the jewelry was not stolen and that Reda had lawful possession for the purpose of perpetrating the "scam."

Cunningham's defense, presented in the same manner, was that Reda and Angel were perpetrating a fraud scheme with Angel's jewelry of which Cunningham had no knowledge. It was Cunningham's position that O'Connor had approached him to find buyers for a commission of 20%.

O'Connor's attorney contended that the government failed to prove that O'Connor had any knowledge of the source of the jewelry or that the jewelry had been stolen. O'Connor's counsel maintained that O'Connor had merely put Reda in contact with Cunningham who was to contact prospective buyers. The jury rejected each defendant's defense.

## II. REDA'S APPEAL

The single issue for appeal presented by Reda was the refusal of the trial court to give a tendered instruction on credibility requested by Reda.

Reda focuses attention on Sam Angel's testimony at trial that he did not know Reda or have any relationship with him, that he had seen Reda "around," but that they had hardly talked. Attention is also directed to the testimony of the two professional card players who testified for the defense that they had seen Angel and Reda talking in the casinos over the years and to defense witness Courson's testimony that Reda had told him of a "scam" he was planning for which Angel was going to furnish some jewelry.

Reda contends that the jury was given no appropriate instruction on what consideration should be given the "impeachment" evidence of the two defense witnesses under which the jury could find that the government's witness Angel had lied about how well he knew Reda. Reda requested the following instruction, which the district court refused to give:

The testimony of a witness may be discredited or impeached by showing that he previously made statements which are inconsistent with his present testimony. The earlier contradictory statements are admissible only to impeach the credibility of the witness, and not to establish the truth of these statements. It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony in other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

The district court, however, did give Instruction No. 24 which read as follows:

Evidence that at some other time a witness, other than the accused, has said or done something, or has failed to say

or do something, which is inconsistent with the witness' testimony at the trial, may be considered by the jury for the sole purpose of judging the credibility of the witness; but may never be considered as evidence or proof of the truth of any such statement.

The district court also gave Instruction No. 28 which read in part:

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to show whether a witness is worthy of belief....

After making your judgment, you will give the testimony of each witness such credibility, if any, as you may think it deserves.

■ We conclude that the instructions given and all the instructions viewed in their entirety, adequately and correctly covered the substance of the requested instruction. A district court has wide discretion in formulating appropriate jury instructions. *United States v. McQuarry*, 726 F.2d 401, 402 (8th Cir.1984). A defendant is not entitled to a particularly worded instruction where the instructions given, when viewed as a whole, adequately and correctly cover the substance of the requested instruction. *See United States v. Lisko*, 747 F.2d 1234, 1238 (8th Cir.1984).

The same instruction requested by Reda was proposed for submission in *United States v. Koonce*, 485 F.2d 374, 378 (8th Cir.1973). The district court rejected the "falsus in uno, falsus in omnibus" instruction in that case. In affirming, the *Koonce* Court held that the district court need not require the jury to disregard a witness' testimony altogether even if it is proved or conceded to be false in part. Defendants' reliance on *United States v. Partin*, 493 F.2d 750 (5th Cir.1974), is misplaced in that the witness in *Partin* was an admitted perjurer on the very subject of the trial. Furthermore, the jury in *Partin* was given

*no* guidance on the evaluation of a witnesses' testimony in the final instructions. *Partin, supra*, 493 F.2d at 762.

We conclude that under the instructions given in this case defense counsel were appropriately able to argue any of the discrepancies in Angel's testimony. *See also United States v. Nance*, 502 F.2d 615, 619 (8th Cir.1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975); *United States v. Brake*, 596 F.2d 337 (8th Cir. 1979). Reda's conviction will be affirmed.

## III. O'CONNOR'S APPEAL

### A. *Sufficiency of Evidence*

■ The first question presented by O'Connor's appeal is whether the district court erred in failing to grant his motion for judgment of acquittal in regard to all three counts because of insufficient evidence.

O'Connor argued that he was merely an innocent prospective buyer or procurer of other buyers and not a part of any criminal scheme. He properly pointed out that guilt cannot be inferred from his mere presence at the scene of a crime or a mere association with members of a criminal conspiracy. *United States v. Brown*, 584 F.2d 252, 263 (8th Cir.1978); *United States v. Taylor*, 612 F.2d 1272, 1273 (10th Cir.1980). However, we conclude that it was reasonable for the jury to infer from the evidence before it, as stated in detail in part I above, that O'Connor was far more than a casual bystander.

■ The standards for reversing a judgment of conviction on the basis of the insufficiency of the evidence have been recently set forth by this Court in *Smith v. Updegraff*, 744 F.2d 1354, 1366 (8th Cir. 1984). We apply the familiar principles stated in that case and in the cases there cited and conclude that O'Connor's argument is untenable. Unlike many of the cases relied upon by O'Connor, actual possession was not an element of any of the charges upon which O'Connor was convicted. The fact that O'Connor may have never had exclusive dominion and control over

the jewelry is inapposite in that possession may be either sole or joint. *United States v. Henneberry,* 719 F.2d 941, 945 (8th Cir. 1983); *United States v. Dugan,* 477 F.2d 140, 141 (8th Cir.1973). In *Dugan,* a conviction of *possession* of chattels stolen from a vehicle moving in interstate commerce was upheld on evidence that the defendant had told customers about the sale and had escorted them to the site of the sale.

■ Once the government has established the existence of a conspiracy, even slight evidence connecting a particular defendant to the conspiracy may be considered to be sufficient proof of the defendant's involvement in the scheme. *United States v. Michaels,* 726 F.2d 1307, 1311 (8th Cir.1984).

The jury could reasonably infer from the evidence presented that O'Connor was guilty of the crimes with which he was charged. When evidence is viewed in the light most favorable to the verdict, the district court did not err in denying O'Connor's motions for judgment of acquittal because of insufficient evidence.

### B. *Instruction*

O'Connor's third issue presented for review adopted by reference the instruction question presented by defendant Reda. That question was determined in part II and is applicable to defendant O'Connor as well.

## IV. CUNNINGHAM'S APPEAL

### A. *Admissibility of Hearsay Statement by Co-conspirator*

#### 1.

■ The first question presented on Cunningham's appeal is whether the district court erred in admitting into evidence a hearsay statement made by an alleged co-conspirator. It will be recalled from our statement of the facts that when Agent Klismet was examining the jewelry in the hotel room he asked Reda whether Cunningham knew the jewelry was "hot" and that Reda responded, "He semi-knows."

Cunningham contends that Klismet's testimony in regard to Reda's response was hearsay and was erroneously admitted.

Under Rule 801(d)(2)(E), Federal Rules of Evidence, a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

This Court has approved the contingent admission of a coconspirator's hearsay statement pending subsequent independent proof and ruling by the district court that all four elements necessary to establish a conspiracy have been shown. *See United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir.1978), most recently approved in *United States v. Fahnbulleh,* 748 F.2d 473 (8th Cir.1984).

In *Bell,* it was concluded that the district court, rather than a jury, must determine whether the government has adduced sufficient evidence to establish (1) that a conspiracy existed, (2) that defendant and declarant were members of the conspiracy, (3) that the declaration was during the pendency of the conspiracy, and (4) that the declaration was in furtherance of the conspiracy before the statement of a co-conspirator is admissible in evidence. *Bell* further recognized that the district court, rather than the jury, must determine whether the foundation for admissibility is established by a preponderance of the evidence. *Bell, supra,* 573 F.2d at 1044.

The district court in this case scrupulously followed the procedures as outlined in *Bell.* A proper objection was made at the time the statement was offered at trial. The district court explicitly ruled at the close of the evidence that the government had met its burden of proving each and every requirement. We affirm the district court's admission of Reda's statement in evidence.

#### 2.

Cunningham argues that the district court erred in its determination that *Bell's* fourth requirement was met. Cunningham attempts to characterize the statement as a

"casual admission of culpability to someone [Reda] had individually decided to trust," rather than a statement in furtherance of the conspiracy. *United States v. Eubanks,* 591 F.2d 513, 520 (9th Cir.1979) (statement to common law wife); *United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir.1975) (statement to another tool dealer); *United States v. Green,* 600 F.2d 154 (8th Cir.1979) (statement to co-conspirator).

Unlike the cases relied upon by Cunningham, Reda's statement was made to induce Klismet to deal with the conspirators or to cooperate in achieving the common objectives of the conspirators. Reda was trying to make a sale—whether actual or as a set up for fraud. His statement furthered this objective, was made in the context of a conversation designed to achieve this end, and can be "fairly viewed as having advanced the interests of the conspiracy." *United States v. Bentley,* 706 F.2d 1498, 1507 (8th Cir. 1983).

The statement was made in furtherance of the conspiracy and is not hearsay pursuant to Rule 801(d)(2)(E). We conclude that it was not error to admit the statement into evidence.

### 3.

■ It is appropriate that we add that the district court recognized early in this case that utilization of the procedures stated in *Bell* under which the statement of an alleged co-conspirator is admitted conditionally, subject to being "connected up" by subsequent proof, always presents a substantial risk of having to declare a mistrial in the event the government failed to "connect up" the case. When asked by defense counsel what he would rule in the event one of the elements was missing, the district judge said, "I will say it's my inclination under those circumstances to grant a mistrial. If I do feel that a cautionary instruction would be sufficient, I will take that attitude, but my general approach is mistrial."

There was no need for a declaration of mistrial in this case because, as we have concluded above, sufficient evidence was adduced to establish the conspiracy before the close of all the evidence. Experience establishes, however, as illustrated by *United States v. Harshaw,* 705 F.2d 317 (8th Cir.1983), that district courts may be required to declare mistrials at the close of all the evidence under the procedures approved in *Bell, supra,* 573 F.2d at 1044. *See also United States v. American Grain & Related Industries,* 763 F.2d 312 (8th Cir.1985), but not yet reported, in which the government's failure to connect the declarant to the conspiracy after the declarant's hearsay statements were conditionally admitted under *Bell's* procedures, required this court to reverse and remand the case for a new trial.

The district courts in this Circuit are to understand that this Court has approved procedures which may be followed that avoid the risk of mistrial that is always a potential if the procedures approved in *Bell* are followed. For *Bell* must be read together with *United States v. Macklin,* 573 F.2d 1046 (8th Cir.1978), decided in tandem with *Bell* by the same panel. *Macklin* made it clear that the procedures approved in *Bell* were permissible, not mandatory.

*Macklin,* like *Bell,* recognized that the determination of the admissibility of a co-conspirator's statement was governed by Rule 801(d)(2)(E) and Rule 104(a) of the then recently promulgated Federal Rules of Evidence. Specifically, *Macklin* stated:

> The new rule requiring a specific determination of the existence of a conspiracy by the court on the record does not alter the traditional discretion of the trial judge to allow the government to place the statement into evidence on the condition that it be later shown by sufficient independent evidence that a conspiracy existed. [citation omitted] It is preferable whenever possible that the government's independent proof of the conspiracy be introduced first, thereby avoiding the danger, recognized in [*United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir. 1977)], of injecting the record with inadmissible hearsay in anticipation of proof of a conspiracy which never materializes.

*Macklin, supra,* 573 F.2d at 1049, n. 3.

While the Eighth Circuit cases decided after *Bell* and *Macklin* have consistently

upheld the procedures outlined in *Bell*, those cases have also made clear that the choice of the procedure to be followed was within the discretion of the district court. *See United States v. Littlefield*, 594 F.2d 682, 686 (8th Cir.1979); *United States v. Apker*, 705 F.2d 293, 308 (8th Cir.1983); *United States v. Howard*, 706 F.2d 267, 270 (8th Cir.1983); *Llach v. United States*, 739 F.2d 1322, 1329, 1334 (8th Cir.1984).[1]

Both *Bell* and *Macklin* have been cited by other circuits with approval. *See United States v. Continental Group, Inc.*, 603 F.2d 444, 456 (3rd Cir.1979); *United v. James*, 590 F.2d 575, 582 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). *See also In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 820 (3rd Cir.1982); *United States v. DuFriend*, 691 F.2d 948, 951 (10th Cir. 1982); *United States v. Hewes*, 729 F.2d 1302, 1312 (11th Cir.1984); and *United States v. Jackson*, 627 F.2d 1198, 1218 (D.C.Cir.1980).[2]

### B. *Severance*

■ Defendant Cunningham further contends that the district court erred in denying his motion to sever his trial from that of his co-defendants on the ground that the defenses asserted by the alleged co-conspirators were antagonistic and prejudicial to him. Cunningham argues that the evidence showed that he was involved in the venture solely to procure buyers for what he thought was a legitimate commission sale. He argues that the arguments by counsel for his co-defendants that the jewelry was not stolen, but had been leased for a fraudulent scheme, had a "spillover effect" which necessarily denied him a fair trial.

Cunningham's argument is untenable. Severance is a matter addressed to the sound discretion of the trial court. Denial of a motion to sever is not grounds for reversal unless defendant affirmatively demonstrates clear prejudice to his right to a fair trial and an abuse of discretion by the trial court. *United States v. Lee*, 743 F.2d 1240, 1248 (8th Cir.1984). Persons charged in a conspiracy together are generally tried together. This is particularly true, where as here, the government's proof for all the defendants is based upon the same evidence and acts. *United States v. Massa*, 740 F.2d 629, 644 (8th Cir.1984).

■ Defendant Cunningham failed to affirmatively demonstrate any prejudice. The two defense strategies were not irreconcilable. *United States v. Singer*, 687 F.2d 1135, 1146 (8th Cir.1982) (strategy must be more than generally antagonistic). The jury could have found Cunningham not guilty whether they believed he did not know the jewelry was stolen or did not know it was leased. The jury chose not to believe Cunningham's theory of the case.

The jury could reasonably be expected to be able to compartmentalize the evidence against Cunningham. It could determine

---

1. Judge McMillian stated in *Llach* and *Howard* that district courts may also decide that a pretrial hearing should be conducted in a particular case in regard to the admissibility of a coconspirator's hearsay statement. Nothing that was said in either *Bell* or *Macklin*, or in the progeny of those cases, should be read as precluding a district court from either conducting a pretrial hearing under Federal Rule 12(b)(3), F.R.Cr.P., or to convene a pretrial conference pursuant to Rule 17.1, F.R.Cr.P., to give appropriate consideration to questions of evidence that may be presented in particular cases. District courts in this Circuit are to understand that Judge McMillian's suggestion may be followed if the district court, in the exercise of its discretion, determines it is appropriate to do so in a particular case.

2. Weinstein's Evidence suggests that the judge should rule on admissibility as soon as possible. Chief Judge Weinstein explained, "It is the authors' experience that in most cases the judge can determine from colloquy, documents marked in advance of trial, suppression hearings and one or two witnesses whether there is sufficient evidence to warrant admission of a coconspirator's statement." 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 104[05], at 104–41, 104–52 (1982). Chief Judge Weinstein also stated that "[t]o the extent possible, the admissibility of coconspirators' statements should be discussed at the pre-trial conference, or if at trial, outside the hearing of the jury. At times, the court will be able to make its determination on the basis of proffers or even on the opening or what it knows of the available proof from the pretrial or suppression hearings."

independently Cunningham's guilt or innocence. *United States v. Reed,* 658 F.2d 624, 629 (8th Cir.1981), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982).

The trial court did not abuse its discretion in denying defendant Cunningham's motion for severance. We conclude that the defendants were properly tried together.

### C. *Instruction*

By addendum to his brief Cunningham adopted by reference Reda's instruction argument. That question was covered in part II and our disposition of that point is also applicable to defendant Cunningham as well.

### V. CONCLUSION

After careful consideration of all the issues raised by defendants Reda, Cunningham and O'Connor, we conclude all questions presented by all three of the defendants are without merit. Therefore, the judgments appealed from are affirmed.

It is so ordered.