UNITED STATES of America, Appellee,

v.

Juvenile Male J.H.H., Appellant.

UNITED STATES of America, Appellee,

v.

Juvenile Male L.M.J., Appellant.

UNITED STATES of America, Appellee,

v.

Juvenile Male R.A.V., Appellant.

Nos. 93–1562 to 93–1564.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1993.

Decided April 26, 1994.

Rick Mattox, Eagan, MN, argued, for appellant in No. 93–1562.

Rae Randolph, Bloomington, MN, argued, for appellant in No. 93–1563.

Robert Malone, St. Paul, MN, argued, for appellant in No. 93–1564.

Linda Thome, Washington, DC, argued, for appellee.

Before BOWMAN, Circuit Judge, LAY and CAMPBELL,[*] Senior Circuit Judges.

BOWMAN, Circuit Judge.

Appellants J.H.H., L.M.J., and R.A.V. appeal their convictions pursuant to 18 U.S.C. § 5031 (1988) for acts of juvenile delinquency, those acts consisting of having conspired to infringe upon civil rights in violation of 18 U.S.C. § 241 (1988), having interfered with federal housing rights by force or threat of force in violation of 42 U.S.C. § 3631 (1988), and having aided and abetted these crimes in violation of 18 U.S.C. § 2 (1988). These convictions stem from appellants' participation in three cross-burnings in the early morning hours of June 21, 1990. We affirm.

### I.

Late in the evening of June 20, 1990, several young men gathered at the home of Arthur Miller III, eighteen years old. R.A.V., seventeen years old, was living at the Miller house. J.H.H., fourteen years old, and L.M.J., sixteen years old, came to the Miller home that evening, along with R.A.E., Psalm Cottrell, and Jason Olson [1], in search of drugs. As the young men talked, the conversation turned to racial issues. Miller, J.H.H., and R.A.V. began discussing their dissatisfaction with racial incidents and their "disgust" at having an African–American family, the Joneses, living in the neighborhood.[2] After further conversation in the same vein, Miller proposed burning a cross saying, "Let's go burn some niggers." Tr. at 132.

Appellants and their cohorts went to the basement of Miller's house and constructed a cross. When it was complete the group took it outside, placed it in the Joneses' fenced backyard, poured paint thinner on it, set fire to it, and ran away. Russell and Laura Jones were awakened about 2:30 a.m. by voices outside their home. Noticing a glow coming from outside, they looked out to witness a cross burning in the middle of their yard. Terrified, the Joneses called the police.

A short time later, Miller, R.A.V., L.M.J., J.H.H., R.A.E., and Jason Olson gathered back at the Miller home and constructed two more crosses. The group then went to a

---

[*] The Honorable Levin H. Campbell, Senior United States Circuit Judge for the First Circuit, sitting by designation.

[1]. Miller pleaded guilty, as an adult, to a misdemeanor charge for his part in the cross-burnings. R.A.E. pleaded guilty, as a juvenile, to a felony for his role. Cottrell left as the first cross was about to be lit and has not been charged in connection with the events that transpired on June 21, 1990. For reasons not apparent from the record, Olson, who was present throughout the evening in question, has not been charged for his part in the cross-burnings.

[2]. Arthur Miller III, lived at 491 Earl Street in St. Paul, Minnesota. Russell and Laura Jones and their five children, an African–American family, moved in across the street at 490 Earl Street in March 1990.

nearby apartment building on McLean Street, in which a number of minorities live, and burned the second cross. About 4:30 a.m., the group burned the third cross at a street corner across from the Joneses' house. Russell and Laura Jones were aroused again by noise and a glow outside their window. Afraid that someone was attacking their family, the Joneses once again called the police.

After police investigated the incident, R.A.V. was charged in Minnesota Juvenile Court with a misdemeanor for violating a St. Paul ordinance prohibiting bias-motivated disorderly conduct.[3] The juvenile court dismissed the charge prior to trial on the ground that the ordinance censored expressive conduct in violation of the First Amendment. The Minnesota Supreme Court reversed and remanded. The United States Supreme Court granted certiorari and held that the ordinance was facially invalid because it regulated the content of speech and was not narrowly tailored to serve a compelling state interest. *R.A.V. v. City of St. Paul,* — U.S. —, —, 112 S.Ct. 2538, 2547, 120 L.Ed.2d 305 (1992).

In October 1992, the United States Attorney for the District of Minnesota filed an information charging appellants as juveniles with violations of 18 U.S.C. § 241[4], 42 U.S.C. § 3631[5], and 18 U.S.C. § 2, aiding and abetting the civil rights violations under §§ 241 and 3631. The District Court[6] conducted a bench trial between January 12 and January 19, 1993. At the trial, Miller, R.A.E., Psalm Cottrell, and L.M.J. testified as to the events that transpired in the pre-dawn hours of June 21, 1990. Russell and Laura Jones testified as to what they experienced and recounted their subjective reactions to the cross-burnings. The District Court also admitted the testimony of Daniel Levitas, a witness offered by the government as an expert on skinheads and other hate groups. Levitas's testimony was presented as evidence of the racial animus of appellants and their intent to threaten the Jones family.

The District Court found each of appellants guilty beyond a reasonable doubt of all three charged offenses. Seeking reversal of their convictions, appellants raise several issues to which we now turn.

## II.

J.H.H. and R.A.V. argue that their convictions under 18 U.S.C. § 241 and 42 U.S.C. § 3631 cannot stand because the expressive act of cross-burning is protected by the First Amendment.[7]

### A.

■ The First Amendment of the United States Constitution declares that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. To fully effectuate this guarantee, the Supreme Court has held that "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First ... Amendment[ ].' " *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) (quoting *Spence v. Washington,* 418

---

3. R.A.V. was the only defendant in the case.

4. 18 U.S.C. § 241 provides:

 If two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, ... [they shall be guilty of an offense against the United States].

5. 42 U.S.C. § 3631 provides:

 Whoever ... by force or threat of force willfully injuries [sic], intimidates or interferes with, or attempts to injure, intimidate or interfere with—

 (a) any person because of his race, color, religion, sex, handicap ... familial status ... or national origin and because he is ... occupying ... any dwelling ...
 [shall be guilty of an offense against the United States].

6. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

7. Recently, a plurality of this Court concluded that 18 U.S.C. § 241 is content neutral on its face. *United States v. Lee,* 6 F.3d 1297, 1300 (8th Cir.1993) (en banc) (Gibson, John R., J., concurring), *cert. denied,* — U.S. —, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994). Appellants do not argue that either 18 U.S.C. § 241 or 42 U.S.C. § 3631 is facially invalid.

U.S. 405, 409, 94 S.Ct. 2727, 2729, 41 L.Ed.2d 842 (1974)) (alteration by this Court). Any regulation that allows the government to discriminate against speech or expressive conduct on the basis of the content of the message conveyed is presumptively invalid. *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, —— U.S. ——, ——, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991).

At the same time, certain categories, or modes, of expression fall outside the shelter of the First Amendment. *See, e.g., Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam). It is well settled that threats of violence are one of the categories of unprotected speech. *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2546 ("threats of violence are outside the First Amendment"); *Watts v. United States*, 394 U.S. 705, 707–708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam); *United States v. Bellrichard*, 994 F.2d 1318, 1321 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 282 (1993). In *Bellrichard*, a case decided just last year, we upheld the defendant's conviction under 18 U.S.C. § 876 (1988) for sending threatening letters to several public officials. We held that these communications were threats undeserving of First Amendment protection. *Bellrichard*, 994 F.2d at 1321.

■ The government argues that the convictions at issue do not violate the First Amendment because J.H.H. and R.A.V. were convicted for using cross-burning as a means to threaten and to intimidate the Jones family. The government points out that 18 U.S.C. § 241 and 42 U.S.C. § 3631 are not directed toward protected speech, but are directed only at intentional threats, intimidation, and interference with federally guaranteed rights. The government further emphasizes that the statutes punish *any* threat or intimidation, or conspiracy to threaten or to intimidate, violating the statutes regardless of the viewpoint guiding the action. This, the government contends, distinguishes prosecution under these statutes from prosecution pursuant to the St. Paul ordinance invalidated in *R.A.V.* We agree.

In *R.A.V.*, the Supreme Court reiterated the well-established principle that some categories of expression fall outside the bounds of the First Amendment. *R.A.V.*, —— U.S. at ——, ——, 112 S.Ct. at 2543, 2546. The Court made clear, however, that the government may not use even these categories of expression as "the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at ——, 112 S.Ct. at 2543. The St. Paul ordinance failed to pass constitutional muster not because it punished "fighting words," but because it punished only those "fighting words" that threaten or provoke violence " 'on the basis of race, color, creed, religion or gender.' " *Id.* at ——, 112 S.Ct. at 2547. Later, finding that the St. Paul ordinance was not narrowly tailored to serve a compelling state interest, the Court observed that a content neutral law, one "not limited to the favored topics," would have the same beneficial effects without trespassing upon the rights secured by the First Amendment. *Id.* at ——, 112 S.Ct. at 2550. Sections 241 and 3631 are such statutes, punishing all threats and intimidation made in connection with the exercise of federally guaranteed rights or privileges.

Moreover, in *R.A.V.* the Court held that, where "the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable," the distinction is adjudged content neutral. *Id.* at ——, 112 S.Ct. at 2545. As an example, the Court offered the statute upheld in *Watts*, 394 U.S. at 707, 89 S.Ct. at 1401, a statute that criminalizes threats of violence made against the President, *see* 18 U.S.C. § 871. Similarly, in *Boos v. Barry*, the Court compared a constitutionally invalid District of Columbia ordinance, which prohibited the display of signs within 500 feet of a foreign embassy if the signs tended to bring the foreign government into "public odium" or "public disrepute," to the constitutionally permissible federal statute prohibiting only "activity undertaken to intimidate, coerce, threaten or harass" a foreign official. *Boos v. Barry*, 485 U.S. 312, 316, 326, 108 S.Ct. 1157, 1161, 1166, 99 L.Ed.2d 333 (1988) (internal quotations omitted). The St. Paul ordinance did not fall within this exception, as the Supreme Court explained, because

the reason why fighting words are categorically excluded from the protection of the First Amendment is not that their content communicates any particular idea, but that their content embodies a particularly intolerable ... *mode* of expressing *whatever* idea the speaker wishes to convey. St. Paul has not singled out an especially offensive mode of expression—it has not, for example, selected for prohibition only those fighting words that communicate ideas in a threatening ... manner.

*R.A.V.,* —— U.S. at —— - ——, 112 S.Ct. at 2548–49.

Unlike the St. Paul ordinance held invalid in *R.A.V.,* § 241 and § 3631 prohibit only a mode of expression, *i.e.,* threats of violence and intimidation. Consequently, even if §§ 241 and 3631 make content distinctions, they are of a kind that poses "no significant danger of idea or viewpoint discrimination." *Id.* at ——, 112 S.Ct. at 2545.

### B.

Recently, we held that a defendant's prosecution under § 241 for cross-burning violated the First Amendment because the jury instructions went beyond the scope of the statute. *United States v. Lee,* 6 F.3d 1297 (8th Cir.1993) (en banc) (per curiam), *cert. denied,* —— U.S. ——, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994). In remanding for a new trial, we held that

> the jury should be instructed that it cannot convict on Count I unless it finds that Lee's actions were done with the intent to advocate the use of force or violence and were likely to produce such action; or that Lee intended to threaten the residents of the Tamarack Apartments or at least to cause residents of the Tamarack Apartments to reasonably fear the use of imminent force or violence.

*Id.* at 1304 (Gibson, John R., J., concurring) (plurality opinion)[8]. This is an altogether appropriate standard for, although cross-burning can be done with the specific intent to intimidate and to interfere with the exercise of protected rights, *see United States v. Hayward,* 6 F.3d 1241, 1251 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994), in other situations, cross-burning may be done for the sole purpose of making a political statement. As reprehensible as such a statement may be, "we cannot take away the liberty of groups whose views most people detest without jeopardizing the liberty of all others whose views, though popular today, may themselves be detested tomorrow." *Aptheker v. Secretary of State,* 378 U.S. 500, 519, 84 S.Ct. 1659, 1670, 12 L.Ed.2d 992 (1964) (Black, J., concurring). Thus, the critical issue in the present case is whether the District Court's finding that the cross-burnings engaged in by appellants were intended as threats, rather than as merely obnoxious, but protected, political statements, is properly supported by the government's proof.

### C.

The trial in this case was held before *Lee* was decided, and the District Court was without the benefit of that decision when making its findings of fact and conclusions of law. Nevertheless, we are satisfied the District Court applied standards consistent with those articulated in the plurality opinion in *Lee.* Moreover, viewing the evidence in the light most favorable to the government, *Lee,* 6 F.3d at 1303 (Gibson, John R., J., concurring), we conclude that the court is entitled to find, as it did, that appellants burned the crosses to threaten the Joneses or to cause the Joneses reasonably to fear the use of imminent force or violence.

Immediately before constructing and burning the three crosses, appellants and their cohorts engaged in a discussion about racial tensions. J.H.H. told of being accosted by three African–Americans. R.A.V. related that an African–American male had recently pulled a knife on him. Arthur Miller testified that the members of the group were "really disgusted" about having an African–American family living across the street from Miller and they decided to do something

---

**8.** We find that these principles are equally applicable to prosecutions brought under 42 U.S.C. § 3631.

about it. Tr. at 120. J.H.H. suggested puncturing the tires of the Joneses' car, but Miller said that had already been done and "it didn't do no good.... They're still there." Tr. at 121–22. R.A.V. brought up the movie "Mississippi Burning," a movie which portrays Klan violence, cross-burnings, and murders, which gave the group the idea of burning a cross. Arthur Miller then said, "Let's go burn some niggers," Tr. at 132, and the group proceeded to build a cross in Miller's basement out of the wooden legs of a bar stool, tape, and cloth. After the cross was built, at least three of the young men, including R.A.V. and J.H.H., entered the Joneses' fenced backyard in the middle of the night with the cross and a can of flammable liquid. The rest of the group, including L.M.J., stood in the street in front of the house. Someone doused the cross with the flammable liquid and set it afire. The young men then fled.

After reassembling at the Miller house, the group built a second and third cross. Appellants and their friends took the second cross to the yard of a nearby apartment complex, in which some minorities lived, sprayed it with a substance to make the flames turn colors, and set fire to the cross. Again they fled. Finally, the group took the third cross to the street corner directly across from the Joneses' house, attached a can of propane to the cross, burned it, and fled. Thus, during the middle of the night, within a two-hour time span, appellants burned three crosses in the yard or in close proximity to the yard of the Jones home.

Shortly after the incident, J.H.H. told a police officer that Arthur Miller and the others did not like African–Americans living in the neighborhood and that the cross-burnings were intended to scare the Joneses. L.M.J. told an FBI agent that the cross-burnings were directed at "some niggers who lived across the street." Tr. at 621. R.A.E. testified that he and the others burned the crosses to threaten and to intimidate the African–American family living across the street from Miller. R.A.V. told a friend the next day that he burned the crosses "[b]ecause he doesn't like niggers, and they wanted them out of the neighborhood." Tr. at

321. Arthur Miller testified that the crosses were burned to send a message to the Jones family to move out.

Both Russell and Laura Jones testified that this message was understood. The Joneses testified that they were awakened at 2:30 a.m. by voices outside and the sound of people running. Russell Jones looked out the bedroom window to see a burning cross, which he described as appearing to be ten feet tall. Terrified, Mr. Jones called the police. He said he felt threatened and was afraid someone was attacking his family. Laura Jones testified that she was fearful that someone was going to hurt their five small children. Even after the police arrived, Mr. Jones would not go outside until he saw that one of the officers was African–American. Both Joneses testified that after the police left, they discussed moving out of the neighborhood.

Shortly after going back to sleep, the beleaguered Joneses were awakened by the third cross burned by appellants. Mr. Jones testified that at this point he felt even greater fear for the safety of his family and was so scared that he would not go downstairs without first grabbing an aluminum bat for protection. Mr. Jones testified that, in his opinion, a cross-burning represents "a threat of death" to an African–American, a "warning that you have to get out of this neighborhood ... [or] you will be sorry." Tr. at 65–66.

■ Appellants argue that the subjective reactions of Russell and Laura Jones are irrelevant to the question of whether appellants are guilty of having threatened the Joneses and that these parts of their testimony should have been disallowed. We disagree. Evidence showing the reaction of the victim of a threat is admissible as proof that a threat was made. *See Watts*, 394 U.S. at 708, 89 S.Ct. at 1401 (noting that a threat must be evaluated in context, including the reaction of the listeners), *quoted in Bellrichard*, 994 F.2d at 1321 (same); *see also Lee*, 6 F.3d at 1303–04 (Gibson, John R., J., concurring) (discussing the reaction of African–Americans who saw the burning cross as evidence of Lee's intent to threaten violence). In evaluating this testimony, we ask whether an objectively reasonable recipient would

view the message as a threat. *Cf. Bellrichard,* 994 F.2d at 1323 (imposing the objectively reasonable person standard on evidence of recipients' reaction to alleged threats made against various public officials). We reject appellants' claim that the testimony of Russell and Laura Jones concerning their reactions to the cross-burnings was inadmissible.

Based on our review of the entire record, we conclude that the evidence supports a finding that the cross-burnings in which appellants engaged were intended to threaten the Jones family with violence or at least to cause the family reasonably to fear the imminent use of force or violence. *See Lee,* 6 F.3d at 1304 (Gibson, John R., J., concurring) (plurality opinion). Consequently, even though these acts may have expressive content, the First Amendment does not shield them from prosecution.

### III.

J.H.H. and R.A.V. next argue that §§ 241 and 3621 are unconstitutionally vague and overbroad. As to the overbreadth argument, we are satisfied that application of the standard of proof set forth in *Lee, see* Part II.B., *supra* at 826, precludes either of these statutes from reaching constitutionally protected conduct.

■ We also are satisfied that neither § 241 nor § 3631 is unconstitutionally vague. The constitutional proscription against vague laws is a basic requirement of due process. Within this doctrine resides the principle that a law should provide reasonable notice to persons of ordinary intelligence of just what it is that the law prohibits. *Becker v. Lockhart,* 971 F.2d 172, 174 (8th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 98, 126 L.Ed.2d 65 (1993). In analyzing whether a particular statute is impermissibly vague, courts must look to both the statutory language and prior judicial interpretations. *Id.* We find that the language of §§ 241 and 3631 is sufficiently precise to put a person of common intelligence on notice that conduct of the sort engaged in by appellants is punishable under these statutes. *See United States v. Gilbert,* 813 F.2d 1523, 1530 (9th Cir.), *cert. denied,* 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987) ("legislation which proscribes the use of force or the threat of force should not be found to be void for vagueness").

■ Appellants' contention that the statutes are vague because they do not specifically proscribe cross-burning is void of merit. As explained earlier, a statute that criminalizes all cross-burnings without regard to circumstances would not be constitutionally viable. Here, however, the evidence shows that appellants engaged in cross-burning as a means to threaten or to intimidate the Joneses because of their race. A statute is not rendered vague merely because it fails to list all possible means of violating its dictates. J.H.H.'s arguments that the statutes are vague because they punish on the basis of the reaction aroused in others and because the meanings of the terms "intimidate" and "interfere" are subjective also are unconvincing. Whether a defendant properly can be convicted of violating 18 U.S.C. § 241 and 42 U.S.C. § 3631 depends upon the totality of the evidence demonstrating the specific intent of the defendant, not upon a subjective evaluation of the terms "intimidate" and "interfere." That the reaction of the victims is admissible as part of the totality of the evidence does not inject vagueness into the statutes.

### IV.

#### A.

J.H.H. and R.A.V. contend that the District Court erred in admitting and relying upon the testimony of Daniel Levitas as proof of their specific intent to intimidate or to interfere with the Joneses' free exercise of their federal rights, an essential element of the crimes with which appellants were charged.

Levitas, the Executive Director of the Center for Democratic Renewal, a civil rights organization that includes among its activities the monitoring of hate groups, was offered by the government during its case-in-chief as an expert on skinheads and skinhead activities. His testimony covered the history of the skinhead movement and described the

skinhead organizations operating in the St. Paul area. He characterized the skinhead movement as one "dedicated wholly to the philosophy of white supremacy, Anti–Semitism and racism." Tr. at 542. He explained the significance of the hairstyle, clothing, music, and tatoos favored by skinheads. Levitas also related how initiation rites of skinhead groups often involve committing acts of racial violence. Levitas then proceeded to discuss other white supremacist groups including the Ku Klux Klan, the Aryan Youth Movement, and the White Aryan Resistance, the latter two organizations founded by Tom and John Metzger. Levitas also mentioned a civil case in which the Metzgers were found liable for the murder of an Ethiopian immigrant in 1988. He went on to discuss the history of the Ku Klux Klan and the historical significance of cross-burning and stated "when a cross is placed on the private property of another person ... it communicates to all who see it that the Ku Klux Klan is present and will engage in the activities that it is notorious for; namely, lynching, murder, assault, and other forms of harassment." Tr. at 552. Levitas then asserted that many individuals in the skinhead movement engage in cross-burnings both for ceremonial reasons and "for the specific purpose of terrorizing and intimidating people and depriving them of their federal civil rights." Tr. at 554.

■ The government contends that appellants were skinheads or "skinhead sympathizers" and offered Levitas's testimony as evidence relevant to the issue of whether appellants had the specific intent to threaten, to intimidate, or to interfere with the Joneses' federal housing rights. The District Court admitted this testimony over the numerous objections of counsel and relied upon it, along with all the other evidence of appellants' intent, to infer their intent to commit the charged offenses. The admission of expert testimony falls within the broad discretion of the trial court, and we will reverse only if admission of the testimony results in an abuse of this discretion. *Arcoren v. United States,* 929 F.2d 1235, 1241 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991).

■ We find the admission of Levitas's testimony troublesome for several reasons. First, the record contains precious little to show that appellants were skinheads or skinhead-sympathizers. The government introduced no evidence demonstrating that appellants were linked with any of the St. Paul-area skinhead groups identified by Levitas. At most, there is a suggestion of some sort of skinhead association based upon appellants' penchant for short hair, combat boots, and tatoos combined with their expression of racist attitudes. This does not strike us as being an adequate foundation for Levitas's testimony.

■ Second, even if the government's evidence were sufficient to serve as a predicate for the admission of Levitas's testimony, admission of the testimony comes dangerously close to permitting the factfinder to adjudge appellants guilty by association. We need not resolve this issue, however, because in a bench trial the prejudicial impact of erroneously admitted evidence, if any error there may be, "is presumed to be substantially less than it might have been in a jury trial." *United States v. Cardenas,* 9 F.3d 1139, 1156 (5th Cir.1993). The improper admission of evidence will be deemed harmless if sufficient admissible evidence exists in the record to establish the defendant's guilt beyond a reasonable doubt without consideration of the inadmissible evidence. *See United States v. Joseph,* 781 F.2d 549, 553 (6th Cir.1986); *United States v. Zurosky,* 614 F.2d 779, 792 (1st Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *cf. O'Connor v. Peru State College,* 781 F.2d 632, 639 (8th Cir.1986) (concluding that admission of incompetent evidence "is not a ground for reversal in a [civil] case tried to the court when there is sufficient competent evidence to support the judgment and it does not appear that the court was induced by the incompetent evidence to make essential findings that it otherwise would not have made"). We turn, then, to the question of whether the admission of Levitas's testimony was, at most, harmless error.

### B.

■ As discussed in Part II.C., *supra* at 826–828, in addition to Levitas's arguably

improperly admitted testimony, the government produced a plethora of competent evidence demonstrating that appellants engaged in cross-burnings with the specific intent to intimidate or to interfere with the Joneses in the exercise of their right to occupy their home. Before burning the crosses appellants spoke of their "disgust" with having the Jones family living across the street and their desire to do something about it. Appellants then focused their efforts primarily on this one family, burning one cross in the Joneses' yard and the other two in close proximity to the Joneses' property, all in the darkness of the post-midnight hours. Appellants made certain the crosses would burn for some time by dousing them with lighter fluid and, in one case, attaching a propane tank to the cross. They even sprayed one of the crosses with a substance to make the flame more garish by burning in different colors. Finally, statements made by both R.A.V. and J.H.H. a few days after the cross-burnings reflect that the specific intent of their actions was to intimidate the Joneses into moving from the neighborhood. We find that the District Court's admission of Levitas's testimony was harmless error as the record contains ample evidence, without consideration of this testimony, to support appellants' convictions, and we are confident that the District Court would have reached the same result even if Levitas's testimony had been excluded.

## V.

The preceding discussion disposes of the claims of J.H.H. and R.A.V. that the evidence is insufficient to support their convictions. We must deal separately, however, with L.M.J.'s sufficiency argument. He contends that, although he was present while his friends discussed building the crosses, while the crosses were constructed, and while the crosses were set afire, the evidence is insufficient to support a finding that he participated in the conspiracy or that he intended to threaten the Joneses with violence.

 L.M.J.'s mere presence at the scene of the unlawful acts or his association with the members of the conspiracy is not enough to establish his guilt. *United States v. Reda,*

765 F.2d 715, 719 (8th Cir.1985). Having established the existence of a conspiracy, however, the government need only offer slight evidence connecting L.M.J. to the conspiracy in order to sustain its burden. *Id.* at 720.

 At trial Arthur Miller, Psalm Cottrell, and R.A.E. testified to the events that occurred on the night of June 20–21, 1990. Of these three, only Miller implicated L.M.J. Miller testified that L.M.J. agreed to burn the crosses and was an active participant. According to Miller, L.M.J. went to the basement when the crosses were built, accompanied the group when the crosses were burned, found the package of material that would make colors when burned and suggested that Miller put it on one of the crosses, and took the third cross to the corner of Earl and Suburban and burned it. Neither of the other witnesses could identify any statements made or particular actions taken by L.M.J. demonstrating his part in the conspiracy, or his intent to threaten or intimidate the Joneses.

The District Court found L.M.J. guilty of all charges, thus crediting Miller's testimony. Great deference must be given to the trial court in its assessment of the credibility of witnesses, and we cannot say that crediting Miller's testimony was clear error.

L.M.J.'s argument that, as a matter of law, he cannot be convicted exclusively upon Miller's testimony lacks merit. We have made it clear that "[a]n accomplice's testimony alone may be sufficient to convict if it is not incredible or insubstantial on its face. This may include both corroborated and uncorroborated testimony." *United States v. Starcevic,* 956 F.2d 181, 184 (8th Cir.1992) (citations omitted). Miller's testimony was neither incredible nor insubstantial on its face. He concisely related the details of the events that occurred the night of the cross-burnings and did not waver in his version of the facts under cross-examination. This testimony provides substantial evidence of L.M.J.'s guilt, and we conclude that the evidence is sufficient to support his convictions.

## VI.

J.H.H. contends that the District Court erred in admitting testimony concerning a statement he made to the St. Paul police on June 23, 1990. He claims that the statement was taken in violation of his Fifth Amendment right against self-incrimination because the police interview was a custodial interrogation and his statement was coerced by threats. A magistrate judge [9] held an evidentiary hearing prior to trial on J.H.H.'s motion to suppress the statement. In his report and recommendation, the magistrate judge found that J.H.H. was not in custody when he made the statement, and that, even if he was in custody, he made a valid waiver of his *Miranda*[10] rights. The judge also found there was no credible evidence that the statement was the product of coercion. In making this finding, the judge credited the testimony of Sergeant Rogers, the officer who conducted the interview. The District Court adopted the magistrate judge's report and recommendation and denied the motion to suppress.

 A trial court's findings concerning custody for *Miranda* purposes are subject to the clearly erroneous standard of review. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990). In *Griffin*, we discussed certain indicia of police custody. *Id.* at 1349. J.H.H.'s interview exhibited none of these common indicia of custody: he was informed that the questioning was voluntary, that he was not under arrest, and that he was free to leave at any time; he was not handcuffed; he was questioned in an unlocked room at the police department by only one officer; he was not threatened or deceived; and he was not placed under arrest at the termination of the interview. After reviewing the record, we find no clear error in the District Court's finding that J.H.H. was not in custody. Nor can we say that any of the court's other findings are clearly erroneous. Accordingly, the motion to suppress

was properly denied, and the District Court did not err in admitting J.H.H.'s statement into evidence at trial.

## VII.

Finally, J.H.H. argues that the District Court abused its discretion by failing to grant his motion for a continuance of his sentencing hearing. He claims that this ruling denied him the opportunity to present mitigating evidence at the sentencing hearing, including witnesses, a psychological evaluation, and evidence to refute statements made in the portion of the Presentence Report (PSR) that explains the government's version of the offense.

 We will reverse because the District Court denied a continuance only if the trial court abused its discretion and the defendant was thereby prejudiced. *United States v. Ulrich*, 953 F.2d 1082, 1085 (8th Cir.1991). We hold that the District Court did not abuse its discretion in refusing to grant J.H.H. a continuance. First, the timing of the sentencing hearing is mandated by 18 U.S.C. § 5037(a) (1988), which requires that when a juvenile is adjudged delinquent the court "*shall* hold a disposition hearing concerning the appropriate disposition no later than twenty court days after the juvenile delinquency hearing."[11] (emphasis added). Moreover, J.H.H. had a full calendar month between the trial and the sentencing hearing to obtain witnesses, a psychological evaluation, and anything else he wished to bring to the court's attention. The portion of the PSR that J.H.H. desired to refute sets forth the facts that were established at trial, and J.H.H. was given an opportunity to provide the probation officer with his version of the facts. Instead of pursuing these matters with diligence, J.H.H. failed to appear for several appointments and did not make himself available to his attorney during the interval between the trial and the sentencing

---

9. The Honorable Floyd E. Boline, United States Magistrate Judge for the District of Minnesota.

10. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

11. The District Court may make an exception to this requirement if the judge desires more information about the juvenile and commits the juvenile to the custody of the Attorney General for "observation and study." 18 U.S.C. § 5037(d) (1988). J.H.H. does not argue that the judge should have taken this action.

hearing. Considering the circumstances, we find that the District Court did not abuse its discretion in denying J.H.H.'s motion for a continuance.

The judgments of the District Court from which these appeals are taken are affirmed.

LAY, Senior Circuit Judge, concurring.

In concurring in this opinion, I in no way disclaim or retract the position expressed in *United States v. Lee,* 6 F.3d 1297, 1304–07 (8th Cir.1993) (Lay, J., concurring and dissenting), *cert. denied,* —— U.S. ——, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994), —— U.S. ——, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994). In the present case, there is significantly more evidence supporting the convictions of the defendants, particularly the numerous statements about what the defendants intended to accomplish by burning the crosses. The extent of the evidence supporting the conviction in *Lee* was essentially the defendant's statement that by burning the cross, "[m]aybe that would get rid of some of the bad blacks that were there, they would take the message seriously and leave." *Id.* at 1298. In the present case, by contrast, there were statements made that the defendants intended to scare the Joneses in particular, that their purpose was to threaten and intimidate, and that they did not like African Americans and wanted them out of the neighborhood.

Of critical distinction is the nature of the threat involved in this case. It is necessary to distinguish between a true threat, which is not protected, and constitutionally protected speech. *See Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam) (in the context of an alleged threat to the President's life in violation of 18 U.S.C. § 871); *see also United States v. Gilbert,* 884 F.2d 454, 456–57 (9th Cir.1989), *cert. denied,* 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990). Whether the defendants' conduct, in burning a cross in the Joneses' yard and across the street from the Joneses' home, constitutes a true threat is a question for the jury. *See Gilbert,* 884 F.2d at 458. In this situation, a jury could find that the defendants specifically directed a threat towards the Joneses. In *Lee,* on the other hand, "the cross burning was not a threat. The cross was not focused on one particular individual, but rather was placed 386 feet away from a three-building apartment complex with at least 15 black families." *Lee,* 6 F.3d at 1307.

In light of these factual distinctions, I agree that the evidence supports the convictions of the defendants in this case.

LEVIN H. CAMPBELL, Senior Circuit Judge, concurring.

I agree entirely with the panel's result. Under stare decisis principles, Judge Bowman's thoughtful opinion follows this circuit's recent en banc analysis in *United States v. Lee,* 6 F.3d 1297 (8th Cir.1993) (en banc). Other circuits have analyzed *R.A.V.* and the related Supreme Court precedent a little differently. *See, e.g., United States v. Hayward,* 6 F.3d 1241, 1249–52 (7th Cir.1993) (evaluating 42 U.S.C. § 3631 under the lesser standard of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). Under any reasonable construction, however, the bottom line in this case should be the same.