UNITED STATES of America, Plaintiff,

v.

Ronald Dean BROCK, James Daniel Soderna, Michael Charles Suhy, Dale Robin Pultz, Colin Lester Hudson, and Marilyn Ruth Hatch, Defendants.

No. 94–CR–86 (JPS).

United States District Court, E.D. Wisconsin.

Sept. 23, 1994.

Matthew L. Jacobs, Asst. U.S. Atty., U.S. Attys. Office, Milwaukee, WI, for plaintiff.

Ronald Dean Brock, pro se.

Eugene R. Pigatti, Pikofsky, Campenni & Pigatti, S.C., Milwaukee, WI, for defendants Soderna, Pultz and Hudson.

Michael Charles Suhy, pro se.

Thomas J. McClure, Osinga & McClure, Milwaukee, WI, Mark J. Beutler, Charlottesville, VA, for defendant Hatch.

Catherine M. Doyle, McCarty, Lenz & Doyle, S.C., Milwaukee, WI, for amicus curiae Milwaukee Women's Medical Services.

Anne Willis Reed, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Milwaukee, WI, Catherine Weiss, Louise Melling, Karen Leiter, Reproductive Freedom Project, American Civ. Liberties Union Foundation, Steven R. Shapiro, American Civ. Liberties Union Foundation, New York City, for amicus curiae American Civ. Liberties Union, American Civ. Liberties Union of Wis.

## DECISION AND ORDER

STADTMUELLER, District Judge.

This criminal case comes before the court on several pretrial motions filed by a number of the defendants. They have moved to dismiss the charges, contending that the statute under which they have been charged is unconstitutional.[1] They have also moved for a

---

1. Technically, two motions to dismiss were filed. Attorney Thomas J. McClure filed a motion on behalf of defendant Marilyn Hatch. Attorney Eugene R. Pigatti filed a motion on behalf of defendants James Daniel Soderna, Dale Robin Pultz, and Colin Lester Hudson. Defendant Ronald Dean Brock subsequently joined in Attorney Pigatti's motion. Defendant Michael Charles Suhy has not filed a motion to dismiss.

bill of particulars, including a notice of intent to use evidence, and a jury trial. Each of the motions is now fully briefed[2] and ready for disposition.

### Facts

On June 6, 1994, each of the named defendants was formally charged by complaint with having violated § 3 of the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248(a)(1). The complaint was based upon an affidavit prepared by Special Agent Matthew J. Gibson of the Federal Bureau of Investigation ("FBI"), which discloses the following facts.

On June 4, 1994, Affiliated Medical Services, Inc. ("Affiliated"), a Milwaukee medical clinic, had thirty-seven morning appointments for reproductive services scheduled. When the director of Affiliated arrived for work at 6:30 a.m., however, the two front entrances of the clinic were blocked. A Chevrolet station wagon was parked directly in the recessed area outside the southern doors, and completely blocked access to those doors. Defendant Suhy was lying on the hood of the Chevrolet. A hole had been cut in the hood, and defendant Suhy had placed his two hands through the grill and the hole in the hood. The floor of the Chevrolet had been removed, and defendant Brock was sitting on the ground, with his torso extending into the passenger area of the vehicle. His right hand was placed inside a pipe that was attached to the frame of the vehicle with concrete and chains.

An AMC Hornet parked parallel to the street blocked access to the recessed area adjacent to Affiliated's northern entrance. The door of the Hornet had been welded shut, and the interior had been reinforced with concrete and metal reinforcing rods. Two holes had been cut in the Hornet's floor, and defendants Hudson and Soderna were sitting on the ground, with their torsos extending up into the passenger area of the vehicle. Defendant Hudson's right hand was handcuffed inside a pipe filled with concrete and bolted to an I-beam, which was welded to the Hornet's frame. Defendant Soderna's hand was handcuffed to concrete reinforcing rods welded to the inside of the automobile. His leg was attached by a metal pipe to the leg of defendant Pultz.

Defendant Pultz, defendant Hatch, and a juvenile were seated in the recessed area between the Hornet and the north entrance. In addition, a fifty-five gallon drum filled with concrete and metal reinforcing rods was placed in that recessed area.

Despite being ordered to do so by Milwaukee police officers, the defendants refused to move away from the clinic entrances. Their positions and the positions of the other obstacles prevented Affiliated staff from gaining access to the clinic. They were not able to gain access until 9:15 a.m., after Milwaukee police had forcibly removed two of the individuals blocking the northern entrance to the clinic. After staff gained access to the clinic, they were able to open a fire escape entrance that had not been blocked, to provide an entrance to the clinic.

Only twenty of the thirty-seven patients with appointments actually received reproductive health services at Affiliated that morning.

On June 10, 1994, the United States Attorney in this district filed an information charging each of the defendants as follows:

> [O]n June 4, 1994, at Affiliated Medical Services, 1428 North Farwell Avenue, a facility that provides reproductive health services ... the defendants herein, did by physical obstruction intentionally intimidate and interfere, and attempt to intimidate and interfere, with persons because they were obtaining reproductive health services, and persons because they were providing reproductive health services, and in order to intimidate any persons from obtaining and providing reproductive health services;

In reviewing the motions to dismiss, I have reviewed all of the arguments made by counsel. This order disposes of both motions.

**2.** Milwaukee Women's Medical Services, the American Civil Liberties Union, and the Ameri-

can Civil Liberties Union of Wisconsin prepared briefs opposing the defendants' motion to dismiss, and sought leave of the court to file those briefs as *amici curiae*. Leave is granted; those briefs have been considered by the court.

All in violation of Title 18, United States Code, Section 248(a)(1).

## The Statute

FACE provides for the imposition of civil and criminal penalties against anyone who

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services . . .

18 U.S.C. § 248(a)(1). "Interfere with" is defined as "to restrict a person's freedom of movement." *Id.* § 248(e)(2). A person "intimidates" another person when that person is placed "in reasonable apprehension of bodily harm to him- or herself or to another." *Id.* § 248(e)(3). "Physical obstruction" means "rendering impassable ingress to or egress from a facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably difficult or hazardous." *Id.* § 248(e)(4). "Reproductive health services" refers to "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy." *Id.* § 248(e)(5). " '[F]acility' includes a hospital, clinic, physician's office, or other facility that provides reproductive health services, and includes the building or structure in which the facility is located." *Id.* § 248(e)(1).

Violations of FACE involving exclusively nonviolent physical obstruction[3] carry penalties of up to six months incarceration and a fine of not more than $10,000.[4] FACE also provides for civil remedies. *Id.* § 248(c).

Finally, FACE includes a First Amendment saving clause:

> . . . Nothing in this section shall be construed—
>
> (1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected by the First Amendment to the Constitution . . .

*Id.* § 248(d).

## Discussion

■■■ The defendants argue that FACE is constitutionally infirm because it is a content-based or viewpoint-based regulation of expressive activity and because it is vague and overbroad.[5] They also argue that they are entitled to a bill of particulars, notice of intent to use evidence, and a jury trial. I will address each of these arguments in turn.

### I

■■■ A government regulation that limits communication because of the message it

---

**3.** As charged in this case. The penalties are greater for violations involving violence, force, or the threat of force. *See* 18 U.S.C. § 248(b).

**4.** For first offenses, as the defendants here obviously face. For subsequent offenses, FACE provides for jail terms up to eighteen months and a fine of not more than $25,000. If the FACE violation results in bodily injury or death, FACE provides for jail terms up to 10 years and life, respectively.

**5.** Defendant Hatch also argues that the criminal information in this case is insufficient because it fails to (1) identify her conduct that constituted "physical obstruction" and (2) identify a "person" whose access she obstructed.

From a constitutional and statutory standpoint, an indictment or information must (1) adequately apprise the defendant of the charge against her so that she can prepare her defense and (2) establish a record that shows when the defense

of double jeopardy may be available to the defendant in the event future proceedings are brought against her. *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir.1981) (citing, *inter alia, Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962)). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

In the instant case, the information tracks the language of FACE, including all the elements of the offense charged, and provides the date and location of the relevant events. The information will not be dismissed as insufficient. Ms. Hatch has been adequately charged with the offense against her and a sufficient record has been established for double jeopardy purposes.

conveys is considered a "content-based" regulation, and is subject to the strictest judicial scrutiny. The defendants argue that FACE is such a regulation.[6]

## A

Initially, I must determine whether the defendants' activity, as described in the June 10 information, is protected by the First Amendment.

The Supreme Court has rejected the "view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Wisconsin v. Mitchell,* —— U.S. ——, ——, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993) (citing *United*

*States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968); *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2544, 120 L.Ed.2d 305 (1992); *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (*per curiam*); *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 464–65, 13 L.Ed.2d 471 (1965)). As a result, the First Amendment does not protect the use of force or threats of force.[7] *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982) ("The First Amendment does not protect violence."); *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (18 U.S.C. § 871(a), which criminalizes threats against the President, is constitutional on its face);

**6.** The defendants' primary argument is framed in First Amendment terms. Defendant Hatch, however, does raise an alternative argument based on the equal protection aspect of the Due Process Clause of the Fifth Amendment. No one has suggested, however, that anti-abortion protesters (or, more accurately, individuals seeking to prevent others from providing or obtaining reproductive health services) make up a suspect classification for equal protection purposes. As a result, unless the defendants can demonstrate a burden or penalty on a fundamental right (i.e., freedom of speech), any equal protection claim would be subject only to rational basis analysis. Under such an analysis, FACE would certainly be valid.

Consequently, defendant Hatch's equal protection argument is essentially a derivative argument; it must necessarily fail unless she can first demonstrate that FACE unnecessarily burdens her freedom of speech rights.

**7.** Counsel for defendants Soderna, Pultz, and Hudson is particularly concerned about FACE's proscription of "threat[s] of force." He argues that (1) because that proscription is not explicitly limited to "genuine" threats, it is unconstitutional; and (2) because that proscription is not limited to the traditional "fighting words" and "incitement to imminent lawless action" categories, it is unconstitutional. I find neither argument persuasive. It is well-settled that, notwithstanding the "fighting words" and subversive advocacy doctrines, the First Amendment does not prohibit Congress from outlawing threats. *See, e.g., United States v. Watts,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (18 U.S.C. § 871(a)); *United States v. Bellrichard,* 994 F.2d 1318, 1318 (8th Cir.) (18 U.S.C. § 876), *cert. denied,* —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 282 (1993); *United States v. Hoffman,* 806 F.2d 703, 706–07 (7th Cir.1986) (18 U.S.C. § 871), *cert. denied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987); *cf. NAACP v. Clai-*

borne Hardware Co., 458 U.S. 886, 926, 102 S.Ct. 3409, 3432, 73 L.Ed.2d 1215 (1982) ("Unquestionably, these individuals [that engaged in violence or threats of violence] may be held responsible for injuries that they caused."). Moreover, Congress need not explicitly limit FACE to "true threats" to comply with the First Amendment; as with other statutes criminalizing threats, the courts will infer such a limitation. *See, e.g., Watts,* 394 U.S. at 707, 89 S.Ct. at 1401.

The defendants also object to FACE's reference to the reactions of listeners. In FACE, "intimidat[ion]" is defined as that conduct which "place[s] a person in reasonable apprehension of bodily harm to him- or herself or another." 18 U.S.C. § 248(e)(3). The defendants argue that, because this passage makes application of the statute depend on the impact of the communication on its audience, FACE is inherently content-based. I disagree. The "reasonable apprehension" language in FACE appears to be a reasonable attempt to limit application of the statute to "true threats." *See, e.g., United States v. Aman,* 31 F.3d 550, 553 (7th Cir.1994) (defining a threat as "whether the recipient could reasonably have regarded the defendant's statement as a threat"); *Wurtz v. Risley,* 719 F.2d 1438, 1441 (9th Cir. 1983) ("implicit in the nature of such punishable threats is a reasonable tendency to produce in the victim a fear that the threat will be carried out"). *Cf. United States v. Lee,* 6 F.3d 1297, 1301 (8th Cir.1993) (en banc) (18 U.S.C. § 241 unconstitutional as applied because defendant punished for threats of force that were not "true threats"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994). Thus, it is distinguishable from the emotive impact language disapproved of by the Supreme Court in *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988).

For further discussion of FACE's intimidation provisions, *see infra* note 20.

*United States v. Bellrichard,* 994 F.2d 1318, 1322 (8th Cir.) ("The First Amendment affords no protection to those who utter direct threats of force and violence toward other persons."), *cert. denied,* —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 282 (1993); *United States v. Khorrami,* 895 F.2d 1186, 1192 (7th Cir.), *cert. denied,* 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990) (upholding conviction under 18 U.S.C. § 876, mailing threatening communications).

FACE, however, prohibits more than just force and threats of force. It also proscribes certain nonviolent forms of "physical obstruction." 18 U.S.C. 248(a). In fact, the information in this case is based on such "physical obstruction." Thus, I must decide whether nonviolent physical obstruction, as practiced by the defendants in this case, can constitute protected activity under the First Amendment.

In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, the Supreme Court has looked to whether "an intent to convey a particularized message was present, and [w]hether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) (quoting *Spence,* 418 U.S. at 410–11, 94 S.Ct. at 2730). Both parts of this inquiry are informed by the context in which the conduct took place. *Id.* at 405, 94 S.Ct. at 2728; *Spence,* 418 U.S. at 410, 94 S.Ct. at 2730. With these principles in mind, the Court has extended First Amendment protections to students wearing armbands to protest American military involvement in Vietnam, *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969); black persons "sitting-in" at a public library to protest segregation, *Brown v. Louisiana,* 383 U.S. 131, 141–42, 86 S.Ct. 719, 329–30, 15 L.Ed.2d 637 (1966); a protester wearing an Army uniform during a skit protesting American involvement in Vietnam, *Schacht v. United States,* 398 U.S. 58,

62, 90 S.Ct. 1555, 1558, 26 L.Ed.2d 44 (1970); protesters displaying picket signs and distributing leaflets outside a courthouse, *United States v. Grace,* 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); black persons boycotting white merchants, *Claiborne,* 458 U.S. 886, 915, 102 S.Ct. 3409, 3426 (1982); individuals desecrating or burning flags, *see Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540; *Spence,* 418 U.S. at 410, 94 S.Ct. at 2730; demonstrators sleeping in parks, *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (application of First Amendment presumed under the circumstances); and an individual burning a cross in a black family's yard, *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2548 ("expression of group hatred").

At first glance, these cases seem to support the proposition that the defendants' blockade of Affiliated is similarly protected by the First Amendment. I do not doubt that the defendants, by blockading Affiliated, intended "to convey a particularized message." [8] Moreover, it is likely that those viewing the blockade understood that message.

■ The problem, however, is the vehicle for that message. When a message is conveyed through an activity that "bears no necessary relationship to the freedom to … distribute information or opinion," the government may proscribe that activity notwithstanding the impact on the message. *Cameron v. Johnson,* 390 U.S. 611, 617, 88 S.Ct. 1335, 1339, 20 L.Ed.2d 182 (1968) (quoting *Schneider v. State,* 308 U.S. 147, 161, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939)). Thus, courts have generally held that messages delivered via physical obstruction, like messages delivered through the use or threat of force, are not protected under the First Amendment. *Id.* at 616–17, 88 S.Ct. at 1338–39; *Cox v. Louisiana,* 379 U.S. 559, 563–64, 85 S.Ct. 476, 480–81, 13 L.Ed.2d 487 (1965) ("A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one

8. I realize, however, that, by blockading the clinic, the defendants not only expressed a message, but also effectively *enforced* that message by pre-

venting individuals from obtaining reproductive health services, including constitutionally protected abortions.

to pass who did not agree to listen to their exhortations."); *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1364 (2d Cir.1989) ("blocking access to public and private buildings has never been upheld as a proper method of communication in an orderly society"); *United States v. Bader*, 698 F.2d 553, 555–556 (1st Cir.1983) (blocking access to Post Office and Courthouse Building not protected).

In sum, the government and *amici* make a strong argument that, under the relevant case law, the defendants' actions in blockading the clinic are simply not entitled to First Amendment protection. I did not hesitate to apply such a categorical approach to the use of force or threats of force. *See* discussion, *supra.* I do hesitate, however, to apply it to nonviolent "physical obstruction." Ultimately, this apparent contradiction is a natural consequence of the courts' historical treatment of a number of activities, including leafletting, picketing, civil rights demonstrations, and boycotts.[9] Traditionally, those activities have been recognized as inextricably intertwined with the rights of speech or petition.[10] Although the defendants' actions in this case may not resemble those traditional forms of protest, FACE could potentially reach such traditional forms of protest. Consider, for example, the case of the anti-abortion protester who, by his nonviolent leafletting or picketing activities, renders passage to a facility "unreasonably difficult or hazardous." Would it make sense to completely deny such activity First Amendment protection? Could the government explicitly regulate such activity according to the content of its message?

Given these concerns, and the defendants' arguments that FACE is (1) facially invalid and (2) invalid even as a regulation of unprotected activity, I will proceed[11] to consider whether FACE's physical obstruction provision[12] is content-neutral, and, if not, whether it is "necessary to serve a compelling state interest and ... narrowly tailored to serve that end." *Burson v. Freeman*, —— U.S. ——, ——, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992).[13]

**B**

In enforcing the First Amendment, courts have been concerned first and foremost with regulations that target speech or expressive activity on the basis of the content of its message.[14] Content-based regulations

---

**9.** It is also important to note that the use of categories in constitutional law stems, at least in part, from a desire to preserve judicial resources, e.g., the realization that we can't "make a federal case" out of every dispute that comes along. In the instant case, that desire must be balanced against the historically favored position of demonstrations and protests.

**10.** With respect to the historical treatment of nonviolent demonstrations, *see* Lawrence Tribe, *American Constitutional Law* 829–30 (1988).

**11.** Because I have recognized that the defendants' actions in this case are not entitled to First Amendment protection, the following section (Part 1B) could be considered a form of overbreadth analysis.

**12.** As I discussed above, I believe that no such review of FACE's provisions governing the use of force and threats of force is necessary, except with respect to the defendants' argument based on the Supreme Court's decision in *R.A.V.* *See* discussion, *infra.* Similarly, notwithstanding the many references in the parties' papers, I don't believe any review of FACE's proscription against interference with the exercise of religious freedom or with the destruction of property is warranted.

**13.** As I discussed above, FACE does include a First Amendment saving clause. Although such clauses may be helpful in determining legislative intent, using them to decide whether any particular activity is entitled to First Amendment protections would appear to be a rather circular approach. Consequently, in deciding to proceed to determine whether FACE is content-based, I did not give that clause any weight.

**14.** Dean Stone has explained the judicial focus on content-based limitations:

It may seem odd that the Court uses a stricter standard of review for content-based restrictions than for content-neutral restrictions, since both "reduce the sum total of information or opinion disseminated." The explanation for this seeming anomaly is that the first amendment is concerned not only with the extent to which a law reduces the total quantity of communication, but also—and perhaps even more fundamentally—with at least three additional factors: distortion of public debate, improper motivation, and communicative impact. These three factors, which are most clearly presented by content-based restrictions, explain both why the Court tests virtually all content-based restrictions of high-value speech

are presumptively invalid, and can only be saved if the government demonstrates that "the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Burson v. Freeman,* —— U.S. at ——, 112 S.Ct. at 1851 (citing, *inter alia, Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)).

The analytical difficulty lies in determining which regulations are content-based, and which are content-neutral.[15] Where "speech" and "non-speech" elements are combined in the same course of conduct, the standard for neutrality has been articulated in at least two ways. At times, the content-neutrality determination has turned on whether the governmental interest in enacting the statute is "unrelated to the suppression of free expression." *See, e.g., Johnson,* 491 U.S. at 407, 109 S.Ct. at 2541. At other times, the inquiry has focused on whether the regulation is "*justified* without reference to the content of the regulated speech." *Ward v. Rock against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).

Regardless of the articulation of the standard, it is clear that our concern is with governmental motivation. *See, e.g., Ward,* 491 U.S. at 791, 109 S.Ct. at 2753 ("the principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."). Judicial scrutiny of that motivation varies widely, however. *Compare United States v.* *O'Brien,* 391 U.S. 367, 378–83, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672, (1968) (Court accepted proffered government purposes, and refused to look into actual congressional motive); and *Barnes v. Glen Theater,* 501 U.S. 560, 568–70, 582–83, 111 S.Ct. 2456, 2461–62, 2468–69, 115 L.Ed.2d 504 (1991) (opinion of the Court, and Souter, J., concurring) (majority opinion inflating the government's interest, and concurring opinion searching for, and finding, hypothetical interest, to justify nude dancing statute); *with Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980) (inferring impermissible motive despite reasonable alternative explanation); and *Spence,* 418 U.S. at 411, 94 S.Ct. at 2731 ("we must examine with particular care the interests advanced by appellee to support its prosecution"). These cases do not necessarily make the objective tests recited above any clearer; they do demonstrate, however, that governmental motivation can be inferred from a number of factors, including the nature of the governmental interest, the extent to which the regulation is narrowly tailored to further that governmental interest, the nature of the restricted expression, and the existence of alternative means for that expression.[16]

In support of the physical obstruction provisions of FACE, the government asserts "compelling interests in ensuring access to reproductive health services and promoting the free flow of goods and services in interstate commerce." Government's Response to Defendants' Pretrial Motions at 20.[17] The

with a single, strict standard of review, and why it does not apply that same standard to all content-neutral restrictions.
Geoffrey R. Stone, *Content–Neutral Restrictions,* 54 U.Chi.L.Rev. 54–55 (1987).

**15.** On the issue of whether FACE is content neutral, I agree with the defendants' argument that the Supreme Court's recent opinion in *Madsen v. Women's Health Ctr., Inc.,* —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593, is not particularly helpful. In considering the issue of content-neutrality in that case, the Court really only considered the fact that (1) "the state court imposed restrictions on petitioners incidental to their antiabortion message because they repeatedly violated the court's original order" and (2) "[t]here is no suggestion in this record that Florida law would not equally restrain similar conduct directed at a target having nothing to do

with abortion." *Id.* at —— —— ——, 114 S.Ct. at 2523–24. My inquiry must necessarily be much broader.

**16.** Doctrinally, consideration of these factors is reserved until *after* the determination on content-neutrality (to determine whether a content-neutral statute is valid under the First Amendment). In practice, however, consideration of these same factors can help us determine the legislative motive behind any particular regulation. For example, regulations that are narrowly tailored to serve interests other than suppression of expression are less likely to be targeted at expression.

**17.** It is clear that FACE also serves several other interests, including "protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy"; "en-

legislative history provides extensive evidence of the effect of clinic blockades and harassment on the number of clinics providing reproductive services, the number of doctors willing to work at those clinics, the number of patients able to obtain services, and the clinics' ability to provide those patients with effective services. *See* S.Rep. No. 117, 103d Congress, 1st Session 12–15 (1993). The legislative history also details the inadequacy of local efforts to address these access issues. *Id.* at 15–18.

FACE's prohibition of physical obstruction addresses these concerns directly. By protecting ingress to and egress from clinics, FACE ensures that access to reproductive health services is not further eroded. By providing for federal criminal and civil remedies, FACE ensures that this access is not dependent upon the vagaries of local police, prosecutors, and courts. Moreover, the possibility of impermissible motive in this case appears remote: Congress' interest in access is a compelling one; FACE addresses that interest directly and narrowly;. and FACE leaves open alternative channels for communication of any "messages" it might proscribe. Finally, FACE's saving clause provides further evidence that Congress was aiming at conduct, not expressive activity.

■■■■■■ Despite this extensive evidence of a governmental interest "unrelated to free expression," the defendants argue that the government, in enacting FACE, was actually targeting expression. In support of this argument, they argue that its intent requirement [18] makes FACE a content-based restriction [19] on speech.[20]

suring the public safety and order"; "protecting the property rights of its citizens"; and protecting "medical privacy." *See Madsen v. Women's Health Ctr., Inc.,* — U.S. —, —, 114 S.Ct. 2516, 2526, 129 L.Ed.2d 593 (1994).

**18.** The defendants also appear to challenge FACE's limitation to facilities providing reproductive health services. FACE is not content-based simply because it focuses on reproductive health services facilities and activity outside those facilities. In regulating speech and expressive conduct, Congress is free to legislate one problem at a time as long as they don't legislate on the basis of the content of the speech or message. As a result, content-neutral regulations that target particular locations do not violate the First Amendment. *See, e.g., Frisby v. Schultz,* 487 U.S. 474, 486, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988) (residences); *Boos,* 485 U.S. at 331, 108 S.Ct. at 1169 (foreign embassies); *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 .(1972) (schools); *Cox,* 379 U.S. at 563, 85 S.Ct. at 480 (courthouses). In fact, such targeting may actually insulate otherwise invalid regulations. *See Boos,* 485 U.S. at 331, 108 S.Ct. at 1169 (in upholding congregation restriction against First Amendment challenge, Court cites favorably the fact that "[u]nlike a general breach of the peace statute, ... the congregation clause is site specific; it applies only within 500 feet of foreign embassies").

**19.** The defendants also argue that FACE's obstruction provisions discriminate based on *viewpoint*. They argue FACE targets messages on one side of the "reproductive health services" debate, i.e., anti-abortion messages. I disagree. The language of the statute does not support such a conclusion; on its face, the statute applies equally to activities directed at the patients and staff of abortion clinics and the patients and staff of centers that counsel women against abortion and in favor of its alternatives. I refuse to assume pretext from FACE's legislative history. The court has been presented with no evidence that the Justice Department wouldn't apply this statute to control violent and obstructive pro-choice protesters.

In support of its argument that FACE only applies to one side of the debate, the defendants argue that FACE would not apply to the following actions taken by ·abortion rights *advocates:* (1) physically obstructing access to (or firebombing) a Catholic hospital solely because that hospital refuses to perform abortions; and (2) shoving an anti-abortion protester outside of a clinic. Under both examples, however, the result would be the same if the action was taken by a pro-life demonstrator at a facility that refuses to perform abortions. This is entirely consistent with the true government interest behind FACE, access to reproductive health *services* (as opposed to access to reproductive health services *facilities* ). Absent the necessary intent to deprive someone from obtaining or providing *services*, FACE simply does not apply.

**20.** The defendants also argue that the legislative history of FACE provides evidence of Congress' illegitimate motive. They provide little or no evidence in support of this argument, however, and, as a result, I will reject it.

In addition, as I discussed earlier, *supra* note 7, the defendants object to FACE's reference to the reactions of listeners. Under FACE, "intimidat[ion]" is defined as that conduct which "place[s] a person in reasonable apprehension of bodily harm to him or herself or another." 18 U.S.C. § 248(e)(3). As a result, physical obstruction is actionable not only when it restrains a

In support of their claim that FACE is content-based, the defendants offer the following reasoning. First, FACE proscribes only that physical obstruction that is motivated by an intent to prevent people from or punish people for providing or obtaining reproductive health services. 18 U.S.C. § 248(a)(1). Second, FACE *does not* proscribe physical obstruction motivated by other concerns. As a result, the argument goes, whether FACE applies or not depends on the content, or subject matter, of the obstructer's message.

■ The defendants' attack on FACE's intent requirement can be divided into three parts. Initially, the defendants argue that the intent requirement makes FACE content-based on its face. Generally, however, a motive requirement will not in and of itself make a regulation "related to the suppression of free expression." State and federal antidiscrimination and civil rights laws do not violate the First Amendment simply because they proscribe only those acts taken with a certain motive. *See, e.g., Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984) (Title VII); *Roberts v. United States Jaycees*, 468 U.S. 609, 628–29, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984) (state antidiscrimination law); *United States v. J.H.H.*, 22 F.3d 821, 826 (8th Cir. 1994) (18 U.S.C. § 241 and 42 U.S.C. § 3631); *United States v. Hayward*, 6 F.3d 1241, 1251 (7th Cir.1993) (42 U.S.C. § 3631), *cert. denied*, —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46. *Cf. Mitchell*, —— U.S. at ——, 113 S.Ct. at 2200 (reaffirming validity of federal and state antidiscrimination laws);

*R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2546 (reaffirming validity of Title VII).

The defendants argue, however, that their behavior is more analogous to sit-ins or picketing, and thus that the case law on civil rights laws and antidiscrimination laws simply is not relevant. Even if the analogy were a good one, the Supreme Court's jurisprudence on picketing simply does not support this argument. Just as the government may proscribe employment decisions, *Hishon*, 467 U.S. at 78, 104 S.Ct. at 2235, membership decisions, *Roberts*, 468 U.S. at 628–29, 104 S.Ct. at 3255, and threats, *Hayward*, 6 F.3d at 1251, only when they are made with a certain intent, it may also proscribe picketing only when it is performed with a certain intent. The Court has consistently upheld the state's right to regulate, and even proscribe picketing "in furtherance of . . . unlawful objectives." *Int'l Brotherhood of Electrical Workers v. Labor Board*, 341 U.S. 694, 705, 71 S.Ct. 954, 960, 95 L.Ed. 1299 (1951) (secondary boycotts). *See, e.g., Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502–03, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949) (antitrust laws); *Cameron*, 390 U.S. at 617, 88 S.Ct. at 1339 (blocking the entrances to courthouses). To the extent that FACE proscribes picketing, it proscribes only picketing "in furtherance of . . . unlawful objectives," i.e., picketing for the purpose of blocking access to a reproductive health services facility.

Second, the defendants argue that even if FACE's intent requirement does not make it content-based on its face, it provides evidence of illegitimate Congressional motive.[21]

person's freedom of movement, but also when it places that person in reasonable apprehension of bodily harm.

There are several reasons why I don't believe an intimidation by physical obstruction charge presents any constitutional problems. First, any challenge to such a charge would essentially be based on the general rule of *R.A.V.*, which, as I discuss below, does not apply to FACE. Second, FACE's definition of physical obstruction limits any concerns of government or audience censorship. Any prosecution for physical obstruction will still require, as a threshold matter, proof of an act that renders access to a facility unreasonably difficult or impossible. Third, such a charge is valid for the same reason an intimidation by threat prosecution is valid. In enacting FACE,

Congress could have outlawed all acts of physical obstruction, regardless of whether anyone was actually seeking access. By requiring, however, that the government prove injury, interference, or intimidation, Congress has helped put FACE in the proper context by limiting prosecution to cases that actually affect access. By doing so, Congress has essentially insured that FACE is limited to "true" physical obstructions. *See supra* note 7.

21. As defendant Hatch argues, in discussing the "because . . ." language:

Congress's repeated insertion of this peculiar phrase belies any claim that intimidation of anti-abortion protesters was not at least one of the objects of the legislation. Were the law's

In support of this argument, the defendants cite the Supreme Court's decision in *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). In that case, the Supreme Court considered a City of Chicago ordinance that limited picketing and demonstrating near school grounds, but explicitly exempted "the peaceful picketing of any school involved in a labor dispute." *Id.* at 93, 92 S.Ct. at 2288. In invalidating the ordinance,[22] the Court focused on Chicago's "wholesale exclusion of picketing on all but one preferred subject," and the resultant poor fit between the statute's provisions and the City's professed interest in school disruption. *Id.* at 100–02, 92 S.Ct. at 2293; *cf. Brown*, 447 U.S. at 461, 100 S.Ct. at 2290 (invalidating an Illinois state statute barring picketing of residences, but explicitly exempting "the peaceful picketing of a place of employment involved in a labor dispute"). In doing so, the Court implicitly called into question the sincerity of the City's professed interest.

Similarly, the defendants argue, Congress in FACE has betrayed its interest in suppressing messages on one disfavored subject (reproductive health services) by implicitly exempting all other messages. There are at least three reasons why this argument is not persuasive. First, the ordinance in *Mosley* explicitly excluded labor picketing from its scope. There is no such explicit exclusion in FACE. Second, FACE, unlike the Chicago ordinance, is targeted at obstruction, not picketing. *See, State v. Migliorino*, 150 Wis.2d 513, 442 N.W.2d 36, 45 (1989) (upholding statute limiting access to medical facilities against constitutional challenge despite labor exception), *cert. denied*, 493 U.S.

1004, 110 S.Ct. 565, 107 L.Ed.2d 560; *cf. Boos*, 485 U.S. at 332–34, 108 S.Ct. at 1169–70 (rejecting a claim based on *Mosley*). Third, unlike the ordinance in *Mosley*, there is an excellent "fit" between the means employed in FACE and the government interests at stake. Given these distinctions, FACE's "labor exemption" (if indeed there is such an exemption[23]), unlike the exemption in *Mosley*, provides me with very little reason to doubt Congress' stated motives for enacting FACE.

Finally, the defendants argue that FACE's intent requirement makes it invalid even if it only reaches conduct that is fully proscribable. In *R.A.V. v. City of St. Paul*, the Supreme Court announced a new general rule: although governmental entities may proscribe entire categories of "speech" (such as "fighting words"), it may be impermissible for them to selectively proscribe within those categories along content-based lines. —— U.S. ——, —— —— ——, 112 S.Ct. 2538, 2544–45, 120 L.Ed.2d 305 (1992). In announcing this rule, the Court also explicitly abandoned its categorical approach to "fighting words." *Id.* at ——, 112 S.Ct. at 2543.[24] It applied this new rule to invalidate a cross burning prosecution under a bias-motivated crime ordinance which, pursuant to state supreme court interpretation, proscribed only those fighting words that "arouse anger, alarm or resentment in others on the basis of race, color, creed, religion, or gender." *Id.* In the instant case, the defendants argue that, although Congress could, consistent with the First Amendment, have proscribed all force, threats, and obstruction, *R.A.V.* precludes it from proscribing only those instances of

---

sole object to guarantee access to abortion clinics, the motive for impeding such access would be immaterial.

**22.** The Court in *Mosley* and in *Carey* invalidated the ordinances on Equal Protection grounds. The analysis essentially mirrored the First Amendment content-based analysis.

**23.** Labor protesters would be subject to FACE if, as is likely, they intended to prevent people from obtaining or providing reproductive health services.

**24.** The Court explained this abandonment in the following way:

We have sometimes said that these categories of expression are "not within the area of constitutionally protected speech," ... or that the "protection of the First Amendment does not extend" to them.... Such statements must be taken in context ... What they mean is that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content.

force, threats, and obstruction motivated by a desire to prevent or punish access to reproductive health services.

This argument assumes, however, that the Court in *R.A.V.* abandoned all categorical distinctions in First Amendment analysis. It did not. By creating an exception to the general rule for regulations "directed at conduct rather than speech,"[25] the Court explicitly retained a categorical distinction between regulations "directed at conduct" and regulations "directed at speech." In later cases, this distinction has been reaffirmed, and the conduct category has been expanded to include potentially expressive activities that "inflict greater individual and societal harms."[26] *Mitchell,* —— U.S. at ——–——, 113 S.Ct. at 2200–01; *cf. Roberts,* 468 U.S. at 628, 104 S.Ct. at 3255 (acts of invidious discrimination, "like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, ... are entitled to no constitutional protection").

As a result, at this point, my analysis comes full circle. In Part IA, *supra* I concluded that, as a general matter, force, threats, and acts of physical obstruction are all examples of "conduct" that is not entitled to First Amendment protection. However, because I felt that FACE, as written, could reach activities entitled to First Amendment protection (e.g., picketing, leafletting, etc.), I went on to consider, in this part (Part IB), whether FACE is a content-neutral statute.

Now, FACE's focus on conduct, which almost doomed the defendants' constitutional

---

**25.** The Court described the exception in the following way:

> Another valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular "secondary effects" of the speech, so that the regulation is *"justified* without reference to the content of the ... speech," ... Moreover, since words can in some circumstances violate law directed not against speech but against conduct ... a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech.... Thus, for example, sexually derogatory "fighting words," among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practice.... Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.
>
> *R.A.V.,* —— U.S. at ——–– ——, 112 S.Ct. at 2546–47.

**26.** Unfortunately, the Court's categorical distinction between statutes that are "directed at speech" and those that are "directed at conduct" is likely to be difficult to apply and open to manipulation.

> Consider, for example, the ordinance that was challenged in the *R.A.V.* case itself. Clearly, that ordinance could be described as being directed primarily at expressive activities that "inflict greater individual and societal harms" or that "produce special harms distinct from their communicative impact." Nonetheless, the Supreme Court held that it was "directed at speech."

The categorical distinction is particularly difficult to apply to statutes that proscribe threats. Generally, threats involve words, or "speech." Moreover, in the *R.A.V.* case itself, the Court implicitly suggested that threats did not fall within its exception for statutes "directed at conduct." *See R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2546 (describing 18 U.S.C. § 871, which proscribes threats against the President, as fully subject to its general rule). Nonetheless, as I discuss below, at least one panel in this circuit has held that a civil rights statute selectively proscribing threats of force is "directed at conduct" and thus not subject to the *R.A.V.* general rule. *Hayward,* 6 F.3d at 1251 (42 U.S.C. § 3631, as applied to a cross-burning incident); *cf. J.H.H.,* 22 F.3d at 826 (holding that 18 U.S.C. § 241 and 42 U.S.C. § 3631 fall within a separate exception to *R.A.V.);* *but cf. United States v. Lee,* 6 F.3d 1297, 1301–02 (8th Cir.1993) (en banc) (Gibson, J., concurring) (as applied to prosecution for cross-burning, 18 U.S.C. § 241 does not fall within *R.A.V.* exception for laws directed at conduct), *cert. denied,* —— U.S. ——, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994).

Thus, the application of *R.A.V.*'s categorical distinction between regulations "directed at conduct" and those "directed at speech" may be problematic in many cases. But perhaps the categorical approach is the only way to reconcile the rather radical holding of *R.A.V.* with the legitimate government interest in selectively punishing certain groups or individuals. *Cf. Hayward,* 6 F.3d at 1258–62 (Flaum, J., concurring) (rejecting application of the "directed at conduct" exception to 42 U.S.C. § 3631, which selectively proscribes threats of force, but ultimately resting the justification for the statute on a similarly unsatisfying distinction between statutes that selectively proscribe particular messages and those that selectively proscribe speech aimed at certain persons or groups).

challenge from the outset, has returned to extinguish their argument based on *R.A.V.* Because *R.A.V.* does not apply to statutes that are "directed at conduct," it does not apply to FACE, which is primarily, or even entirely, "directed at conduct."

This assumes, however, that our definition of "conduct" has not changed. With respect to the use of force, this seems to be a safe assumption. *See, e.g., Mitchell,* —— U.S. at ——, 113 S.Ct. at 2201. Moreover, at least one panel in this circuit has held that a civil rights statute that selectively proscribes threats of force is similarly "directed at conduct" and thus not subject to the *R.A.V.* general rule. *Hayward,* 6 F.3d at 1251 (42 U.S.C. § 3631); *cf. J.H.H.,* 22 F.3d at 826 (holding that 18 U.S.C. § 241 and 42 U.S.C. § 3631 fall within separate exception to *R.A.V.*); *but cf. United States v. Lee,* 6 F.3d 1297, 1301–02 (8th Cir.1993) *(en banc )* (Gibson, J., concurring) (as applied to prosecution for cross burning, 18 U.S.C. § 241 does not fall within *R.A.V.* exception for laws directed at conduct), *cert. denied,* —— U.S. ——, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994). Finally, although there has been no case law on the subject, it seems clear to me that physical obstruction is "conduct" for *R.A.V.* purposes.

 Thus, the defendants' three-part argument is not persuasive. FACE's intent

requirement does not make it a content-based restriction on speech. Rather, it is *"justified* without reference to the content of" any regulated speech and serves a governmental interest "unrelated to the suppression of free expression." As a result, to the extent that it regulates expressive conduct, it should be analyzed as a time, place, and manner restriction on speech.[27]

## C

 The Supreme Court has articulated a number of different standards of review for content-neutral[28] regulations such as FACE.[29] Each standard requires a court to balance the "extent to which the communicative activity is in fact inhibited" with the "values, interests, or rights served by enforcing" the regulation. Lawrence Tribe, *American Constitutional Law* 979 (1988).[30] Generally, however, content-neutral regulations are valid if (1) they are narrowly tailored to serve a significant or substantial governmental interest and (2) they leave open ample alternative channels for communication of the information. *See Clark,* 468 U.S. at 293, 104 S.Ct. at 3069. Although regulations must be narrowly tailored to serve the government's legitimate, content-neutral interests, they "need not be the least restrictive or least intrusive means of doing so." *Ward,* 491

---

**27.** The Supreme Court has analyzed content-neutral regulations that regulate both speech and conduct as, alternatively, time, place, and manner regulations of speech, and regulations of symbolic conduct. *Compare Clark,* 468 U.S. at 293, 104 S.Ct. at 3069 ("time, place and manner regulations" are valid if they "are narrowly tailored to serve a significant governmental interest, and ... they leave open ample alternative channels for communication of the information") *with O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679 (a content-neutral regulation of symbolic speech is justified if "it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; ... and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest"). In recent cases, the Court has recognized that there is little, if any difference between these two standards. *Clark,* 468 U.S. at 298, 104 S.Ct. at 3071. I will analyze FACE as a time, place and manner regulation of speech.

**28.** Professor Tribe has described content neutral regulations as those for which "government does

not *aim* at ideas or information but seeks a goal independent of communicative content or impact, with the *indirect* result that the flow of information or ideas is in some significant measure constricted." Lawrence H. Tribe, *American Constitutional Law* 977–78 (1988).

**29.** *See* Geoffrey R. Stone, *Content–Neutral Restrictions,* 54 U.Chi.L.Rev. 46, 48–50 (1987).

**30.** *See also* Stone, *supra,* at 58:

The Court does not speak explicitly in these terms. There is a strong correlation in practice, however, between the extent to which a challenged law actually interferes with the opportunities for free expression and the Court's use of the strict, intermediate, and deferential standards of review identified earlier. When the challenged restriction has a relatively severe effect, the Court invokes strict scrutiny. When the challenged restriction has a significant but not severe effect, the Court employs intermediate scrutiny. And when the restriction has a relatively modest effect, the Court applies deferential scrutiny.

U.S. at 798, 109 S.Ct. at 2758. The requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799, 109 S.Ct. at 2758.

In the instant case, the interests served by FACE far outweigh its inhibitive effect on communicative activity. As I discussed above, the governmental interests in ensuring access to reproductive health services and preventing violence outside clinics are compelling, and FACE narrowly addresses those interests. Given the extensive record of violence, threats, and harassment at clinics prior to FACE, it is clear that the Government's interests "would be achieved less effectively absent the regulation." On the other hand, if in fact FACE inhibits expressive or communicative activity, that inhibition is slight indeed. Even under FACE, protesters may go to clinics and express their message—that abortion is wrong—to doctors, staff, and clients, as long as they refrain from the use of force, threats of force, and physical obstruction.

■ In short, FACE is a content-neutral statute that (1) is narrowly tailored and (2) leaves anti-abortion protesters with ample alternative means of communicating their message. As a result, it does not violate the First Amendment.

## II

■ The defendants also argue that FACE is overbroad and vague, and that it violates the Religious Freedom Restoration Act ("RFRA"). I will comment briefly on each of these arguments. First, FACE is not overbroad. In considering the overbreadth of statutes, the Supreme Court has stated that "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973). As I discussed in Part I, to the

extent that FACE reaches expressive activity, it is a permissible time, place, and manner regulation of that activity. As a result, FACE is not only not "substantially" overbroad, it is not overbroad at all.[31]

■ Second, FACE is not impermissibly vague. "[T]he ordinary person exercising ordinary common sense can sufficiently understand" its terms. *Broadrick,* 413 U.S. at 608, 93 S.Ct. at 2914 (citations omitted). "People of common intelligence" need not necessarily "guess at its meaning" or "differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). FACE gives "fair notice to those to whom [it] is directed." *Grayned,* 408 U.S. at 112, 92 S.Ct. at 2301. Moreover, many of its terms have already survived vagueness challenges in similar contexts. *See, e.g., Cameron,* 390 U.S. at 616, 88 S.Ct. at 1338 ("obstruct"; "interfere"; "unreasonably"); *United States v. Gilbert,* 813 F.2d 1523 (9th Cir.1987) ("force"; "threat of force"), *cert. denied,* 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127.

■ Finally, FACE does not violate RFRA. RFRA provides in relevant part as follows:

> Government may substantially burden a person's exercise of religion only if it demonstrates that the application of that burden to the person—(1) is in furtherance of a compelling government interest and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000bb–1(b). The defendants have not explicitly argued that limitations on the use of force, threats of force, or physical obstruction against those seeking reproductive health services "substantially burden[s]" their exercise of religion. Obviously, if it does not, FACE does not violate RFRA. If FACE does represent such a substantial burden, it nonetheless would not violate RFRA. As I noted above, FACE addresses governmental interests in preventing violence and ensuring access to reproductive health services. Those interests are compelling, and

---

**31.** As I noted earlier, given my analysis in Part 1A (i.e., that physical obstruction is not protected under the First Amendment), one could argue that I addressed the defendants' overbreadth argument in Part 1B.

FACE is the least restrictive means of furthering them.

Based upon my analysis, I find that FACE is neither a content based restriction on speech nor a vague or overbroad statute. Accordingly, the defendants' motions to dismiss will be denied.

### III

Having determined that the Freedom of Access to Clinic Entrances Act of 1994 passes constitutional muster, I will now address the balance of the defendants' motions.[32]

### A

 Rule 7(f) of the Rules of Criminal Procedure governs bills of particulars:

The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

To determine whether a bill of particulars is necessary, the court must look at "whether the government's indictment [or information] sufficiently apprises the defendant of the charges to enable him to prepare for trial." *United States v. Canino*, 949 F.2d 928, 949 (7th Cir.1991) (citing *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1701, 118 L.Ed.2d 410 (1992), and *cert. denied*, —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). A bill of particulars is not required when the information necessary to the defendant's defense can be obtained through "some other satisfactory form." *Id.* (citing Charles Alan Wright, *Federal Practice and Procedure* § 129, pp. 436–

38 (1982)). Moreover, a defendant has no right to discover, through a bill of particulars, the evidentiary details of the government's case. *United States v. Glecier*, 923 F.2d 496, 501–02 (7th Cir.) (the Constitution and Rule 7(f) "do not require the government to reveal the details of how it plans to prove its case"), *cert. denied*, —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991).

In requesting a bill of particulars, the defendants argue that they need the following information in order to prepare for trial:

—the name and address of the juvenile named in the affidavit in support of the criminal complaint;

—a description of their actions that amounted to "physical obstruction" and "intimidation";

—the names and addresses of people the defendants allegedly "interfered with" or "intimidated";

—the names and addresses of the witnesses the government expects to call at trial.

The government objects to this request, arguing that its applicable "open file" policy obviates the need for a bill of particulars.

 I agree with the government. The government's open files, along with Agent Gibson's affidavit, provide a satisfactory alternative to a bill of particulars. *See Canino*, 949 F.2d at 949. They provide the defendants with sufficient information to prepare their defense. For the most part, the defendants are seeking evidence, such as the witness list and the list of the targets of the defendants' intimidation and interference. As I discussed above, such discovery falls outside the scope of a bill of particulars. The defendants also request that the court order the government to list those actions that constitute "intimidation" and "interference," as charged in the information. Those actions are already sufficiently referenced in the government's information and Agent Gibson's affidavit, and, without a doubt, are suf-

**32.** Attorney Thomas J. McClure, who represents defendant Marilyn Hatch, filed three motions: a motion for a bill of particulars, a motion for notice of intent to use evidence, and a motion for a jury trial. Attorney Eugene R. Pigatti, counsel for defendants James Daniel Soderna, Dale Robin Pultz, and Colin Lester Hudson, only filed a motion for a bill of particulars and a motion for a jury trial. Defendant Ronald Dean Brock subsequently joined in Attorney Pigatti's motions. Defendant Michael Charles Suhy has not filed any motions on these matters.

In reviewing the motions, I have reviewed all of the arguments made in both sets of briefs. This order disposes of both sets of motions.

ficiently detailed in reports in the government's file. The defendants are not entitled to obtain, through a bill of particulars, the evidence the government intends to rely on to prove that those identified actions actually constituted "intimidation" or "obstruction" under FACE.

## B

The defendants' motion for notice of intent to use evidence will also be denied. Rule 12(d)(2) provides that

the defendant may, in order to afford an opportunity to move to suppress evidence under subdivision (b)(3) of this rule, request notice of the government's intention to use (in its evidence in chief in trial) any evidence which the defendant may be entitled to discover under Rule 16 subject to any relevant limitations prescribed in Rule 16.

To the extent that the government's open files contain information that is subject to Rule 16 discovery, Rule 12(d)(2) creates a notice requirement. The open file policy does not, in and of itself, satisfy this notice requirement because it does not specify which evidence the government intends to use at trial. See, e.g., United States v. Kelley, 120 F.R.D. 103, 107 (E.D.Wis.1988). In its brief opposing the defendants' motions, however, the government has stated that it "intends to use all the material discoverable under Rule 16, access to which has been or will be provided to defendant Hatch under its open-file policy, as evidence in chief at trial." Thus, the defendants' motion is moot; the government has provided notice of its intent to use *all* of the evidence in its open file that is subject to Rule 16.[33]

## C

The defendants have also moved for a jury trial. By its terms, the Sixth Amendment guarantees a jury trial "[i]n all criminal prosecutions."[34] The Supreme Court has held that this guarantee does not apply to "petty" crimes and offenses, however. *Blanton v. North Las Vegas,* 489 U.S. 538, 541, 109 S.Ct. 1289, 1292, 103 L.Ed.2d 550 (1989).

To determine whether a crime is "petty" or "serious," the court must consider "objective indications of the seriousness with which society regards the offense." *Id.* at 541, 109 S.Ct. at 1292 (citations omitted). "The best indicator of society's views is the maximum penalty set by the legislature." *United States v. Nachtigal,* —— U.S. ——, ——, 113 S.Ct. 1072, 1073, 122 L.Ed.2d 374 (1993). The maximum period of incarceration provides the primary indicator; in fact, the Supreme Court has decided that offenses carrying maximum prison sentences of six months or less are presumptively "petty." *Blanton,* 489 U.S. at 543, 109 S.Ct. at 1293. An individual charged with a presumptively petty crime is entitled to a jury trial "only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Id.* The Supreme Court has repeatedly emphasized that the presumption will only be "punctured" in the rare case. *Nachtigal,* —— U.S. at ——, 113 S.Ct. at 1074; *Blanton,* 489 U.S. at 543, 109 S.Ct. at 1293.

In the instant case, the defendants face a maximum prison sentence of six months.[35] As a result, their offenses are presumptively "petty" for the purposes of the constitutional right to a jury trial. But they are also subject to a fine of not more than $10,000. The defendants argue that those

---

**33.** Obviously, the government might not end up using all of the discoverable information in its files. At this time, however, the court has no reason to doubt the sincerity of the government's statement. Moreover, it is important to remember that the purpose of Rule 12(d)(2) is to give the defendants an opportunity to move to suppress evidence. The government's notice in this case simply alerts the defendants to the fact that they should look at all of the discoverable material in the open file in considering any motion to suppress.

**34.** The jury trial right is also based on Article III, Section 2 of the Constitution, which provides that "[t]he Trial of all crimes, except in cases of Impeachment, shall be by Jury ..." For ease of reference, I refer throughout this order only to the Sixth Amendment right.

**35.** The defendants argue that, because the information in this case does not explicitly charge them with a nonviolent physical obstruction, they are subject to the penalties for violent violations

additional fines are sufficiently onerous to overcome the six-month presumption. In support of that argument, they point to 18 U.S.C. § 19, which defines "petty" offenses as those misdemeanors for which the maximum sentence is no greater than six months and the maximum fine is no greater than $5,000. 18 U.S.C. § 19; 18 U.S.C. §§ 3571(b)(6)–(7), 3581. The defendants argue that § 19 represents a "legislative determination that the offense in question [any offense carrying maximum penalties exceeding six months incarceration and a $5,000 fine] is a 'serious' one." *Blanton*, 489 U.S. at 543, 109 S.Ct. at 1293. As a result, they argue, the FACE charges against the defendants involve "serious" offenses.

The defendants' argument is consistent with the approach taken in several circuit courts. *See, e.g. United States v. McAlister*, 630 F.2d 772, 774 (10th Cir.1980); *United States v. Hamdan*, 552 F.2d 276, 280 (9th Cir.1977); and *Douglass v. First National. Realty Corp.*, 543 F.2d 894, 902 (D.C.Cir. 1976) (all using the former 18 U.S.C. § 1(3), a provision defining "petty offenses"). Moreover, the Supreme Court has, at times, "looked to the federal classification scheme in determining when a jury trial must be provided." *Blanton*, 489 U.S. at 545 n. 11, 109 S.Ct. at 1294 n. 11.

At times, however, the Supreme Court and, more recently, the Seventh Circuit, have discouraged excessive emphasis on the federal classifications. *Muniz v. Hoffman*, 422 U.S. 454, 477, 95 S.Ct. 2178, 2191, 45 L.Ed.2d 319 (1975) ("[b]ut in referring to [Congress' definition of "petty crimes,"] ... the Court accorded it no talismanic significance ..."); *In re Betts,.* 927 F.2d 983, 986 (7th Cir.1991); *United States v. Kozel*, 908 F.2d 205, 206–07 (7th Cir.1990) ("Section 19 neither expands nor limits a defendant's statutory right to a jury trial for criminal contempt and may inform but does not control interpretation of

the jury clauses in Article III and the Sixth Amendment."), *cert. denied*, 498 U.S. 1089, 111 S.Ct. 969, 112 L.Ed.2d 1055 (1991); *cf. Nachtigal*, —— U.S. at ——, 113 S.Ct. at 1074 (no mention of Congressional classification; $5,000 fine not sufficient to "puncture" the six month incarceration presumption).

Ultimately, there are several reasons why I am not persuaded that the $10,000 fine provision in FACE is sufficiently severe to overcome the *Blanton* presumption. First, the Supreme Court has repeatedly emphasized that the presumption will only be punctured in the rare case. *See, e.g., Nachtigal*, —— U.S. at ——, 113 S.Ct. at 1074; *Blanton*, 489 U.S. at 543, 109 S.Ct. at 1293. Second, several recent cases suggest a trend of strict application of the presumption. *See Nachtigal*, —— U.S. at ——, 113 S.Ct. at 1074 (rejecting a jury trial claim for prosecution under a statute that provided for incarceration up to six months and a fine of not more than $5,000 as a "relatively routine application of the rule announced in *Blanton*"); *United States v. LaValley*, 957 F.2d 1309, 1312 (6th Cir.) (summary rejection of jury trial claim for offense carrying maximum penalties of six months in jail, a $5,000 fine, and a five year term of supervised release), *cert. denied*, —— U.S. ——, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992). Finally, as the government points out, the differential penalty structure in FACE [36] provides evidence of a "legislative determination that the offense" of nonviolent physical obstruction is *not* a "serious one." *Blanton*, 489 U.S. at 543, 109 S.Ct. at 1293.

I recognize that "the prospect of imprisonment for however short a time will seldom be viewed by the accused as a trivial or 'petty' matter." *Baldwin v. New York*, 399 U.S. 66, 73, 90 S.Ct. 1886, 1890, 26 L.Ed.2d 437 (1970). The Supreme Court has determined, however, that, in almost all cases involving offenses punishable by up to six months in-

---

of FACE (up to one year in prison and a $100,000 fine).

I disagree. As I discussed above, *supra* note 3, although it did not specify as much in the information charging the defendants, the government has made it very clear that it is charging the defendants with *nonviolent physical obstruction*. I plan to treat this case as a nonviolent physical obstruction case. FACE sets out specific penal-

ties for nonviolent, as opposed to violent, physical obstruction. Those penalties are the relevant penalties for Sixth Amendment purposes.

**36.** *Penalties for nonviolent obstruction are limited to a maximum of six months in jail and a $10,000 fine; all other offenders are subject to at least one year in jail and a fine of not more than $100,000.*

carceration, the disadvantages of imposing such punishment without a jury are "outweighed by the benefits that result from speedy and inexpensive nonjury adjudications." *Blanton,* 489 U.S. at 543, 109 S.Ct. at 1293 (citing *Baldwin,* 399 U.S. at 73, 90 S.Ct. at 1890). This prosecution is just such a case.

### Conclusion

For all of the foregoing reasons, FACE is not unconstitutional, and the defendants are not entitled to a bill of particulars, notice of intent to use evidence, or a jury trial. Accordingly,

**IT IS ORDERED** that the defendants' motions to dismiss be and the same are hereby **DENIED;**

**IT IS FURTHER ORDERED** that the defendants' motions for bills of particulars be and the same are hereby **DENIED;**

**IT IS FURTHER ORDERED** that defendant Hatch's motion for notice of intent to use evidence be and the same is hereby **DENIED** as moot; and

**IT IS FURTHER ORDERED** that the defendants' motions for trial by jury be and the same are hereby **DENIED.**